**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| DAVID ARRINGTON, | ) |
| | ) |
| Plaintiff, | )    C.A. No. 07-0170 (RBW) |
| | ) |
| v. | ) |
| | ) |
| DISTRICT OF COLUMBIA, *et al.*, | ) |
| | ) |
| Defendants. | ) |

_____)

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants District of Columbia ("District") and Metropolitan Police Department

Detective Milton Norris, by and through their undersigned counsel and pursuant to Fed.

R. Civ. P. 56, respectfully request that the Court enter judgment in their favor.  As

explained more fully in the accompanying Memorandum of Points and Authorities, when

considering the undisputed material facts in the light most favorable to the Plaintiff,

Defendants are entitled to judgment as a matter of law.  Accordingly, judgment in favor

of the Defendants is appropriate.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

___/s/  Samuel C. Kaplan_____
SAMUEL C. KAPLAN (463350)
Assistant Deputy Attorney General

____/s/  Shana L. Frost_____
SHANA L. FROST (458021)

Assistant Attorney General
441 4th Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6534
Fax:  (202) 727-3625
shana.frost@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

)
**DAVID ARRINGTON,**                                    )
                                                        )
       **Plaintiff,**                    )    **C.A. No. 07-0170 (RBW)**
                                                        )
    **v.**                                           )
                                                        )
**DISTRICT OF COLUMBIA,** *et al.,*                     )
                                                        )
      **Defendants.**                     )
_____)

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1.     On August 25, 2006, Detective Milton Norris was in an unmarked MPD cruiser traveling eastbound on Pennsylvania Avenue, SE when he heard three gunshots to his right. Ex. 1 (Norris Dep. at 26-27);[1] Ex. 2 (Norris Statement).

2.      Detective Norris looked over towards where he heard the sound and saw an individual later identified as Dwayne Shorter walking down the street holding a 9 mm handgun. Ex. 1 (Norris Dep. at 26-27; 34); Ex. 2 (Norris Statement).

3.     Detective Norris observed Shorter walk eastbound on Pennsylvania Avenue with the gun in his right hand, and then turn right off of Pennsylvania Avenue towards L'Enfant Square, SE. Ex. 2 (Norris Statement).

4.     Detective Norris momentarily lost sight of Shorter, but turned onto Minnesota Avenue, SE, in the direction in which Shorter was heading, and spotted Shorter on the next block, walking westbound on Nicholson Street, SE. Ex. 2 (Norris Statement); Ex. 1 (Norris Dep. at 49-52).

---

[1] During the depositions of the police officers in this case, counsel for Defendants asserted the law enforcement investighatory privilege regarding information related to the criminal investigation of Dwayne Shorter. Undersigned counsel agreed to permit counsel for Plaintiff to inquire into certain matters of the incident involving Shorter to the extent such information could be relevant to Plaintiff's case, on the condition that the parties agree to keep the deposition transcripts confidential pending the entry of an appropriate protective order. On July 28, 2008, undersigned counsel submitted a draft protective order to Plaintiff's counsel for her consideration. Despite Plaintiff's counsel's assurances that Plaintiff would respond to the draft protective order with comments so that the parties could file a joint motion with the Coutr, at the time of the filing of this motion, Plaintiff has not so responded. The portions of the transcript that are attached here are are portions that undersigned counsel has determined do not contain confidential information. Defendants do not waive their assertion of confidentiality as to any other portion of the deposition transcripts that the parties have expressly agreed will be kept confidential.

5.     Detective Norris turned right onto Nicholson Street and pulled up alongside of Shorter.  Ex. 1 (Norris Dep. at 37-38).

6.     Detective Norris identified himself to Shorter as a police officer.  Detective Norris also had the police light on the dash of his unmarked cruiser activated.  Detective Norris told Shorter to stop and that he wanted to talk to him.  Ex. 1 (Norris Dep. at 38-39; 48-49).

7.     Believing Shorter to still be armed, Detective Norris withdrew his service weapon.  Ex. 2 (Norris Statement).  Shorter ignored Detective Norris' command to stop, and began to run westbound on Nicholson, turning left into an alley running parallel between Minnesota Avenue and Prout Street, SE.  Ex. 1 (Norris Dep. at 48-49); Ex. 2 (Norris Statement).

8.     Detective Norris exited his squad car and ran into the alley after Shorter.  Ex. 2 (Norris Statement); Ex. 1 (Norris Dep. at 48-49; 52-53).  As he was running, Shorter reached into his pants and pulled out a handgun, pointing it in the direction of Detective Norris.  Ex. 2 (Norris Statement); Ex. 1 (Norris Dep. at 54-55).

9.     Shorter fumbled with the gun and dropped it.  Ex. 2 (Norris Statement); Ex. 1 (Norris Dep. at 56-57); Ex. 4 (Arrington Statement at 5, 6, 7, 10, 12.  As Shorter stopped and reached for the gun, Detective Norris aimed his weapon at Shorter and ordered him to not pick up the gun.  Ex. 2 (Norris Statement).

10.     Rather than comply with Detective Norris's command, Shorter reached down, picked up the gun, and again pointed it in Detective Norris's direction.  Ex. 2 (Norris Statement); Ex. 1 (Norris Dep. at 59-60).

11.     When Shorter pointed his gun at Detective Norris, Detective Norris believed that Shorter was going to shoot him.  Ex. 1 (Norris Dep. at 56-57).

12.     Detective Norris fired one shot from his service revolver at Shorter.  Ex. 2 (Norris Statement); Ex. 1 (Norris Dep. at 58-59).  The round, however, hit Plaintiff, who was further down the alley and on his way to a pizza shop.  Ex. 3 Arrington Dep. at 30-31).  Detective Norris did not see Plaintiff until after the shot was fired.  Ex. 1 (Norris Dep. at 68-69).

13.     Prior to getting shot, Plaintiff heard the gunshots from Pennsylvania Avenue, but continued on his way to the pizza shop through the alley when he observed two individuals running towards him.  Ex. 3 (Arrington Dep. at 30-33).  Plaintiff heard one of the individuals say "freeze," and then heard a gunshot.  Ex. 3 (Arrington Dep. at 36, 40).

14.     When Plaintiff heard one of the individuals say "freeze," he turned away from the two individuals to go in the other direction.  Ex. 3 (Arrington Dep. at 39-40); Ex. 4 (Arrington Statement at 8, 12).  Plaintiff stated that he did not know whether the

person was going to pick up the gun that he had dropped and shoot him.  Ex. 4 (Arrington Statement at 5).

15.    It is Plaintiff's belief that Detective Norris was shooting at the person that had the gun, and that Detective Norris did not intentionally shoot him.  Ex. 4 (Arrington Statement at 5); Ex. 3 (Arrington Dep. at 49-50).

16.    Plaintiff admits that Detective Norris never ordered Plaintiff to take any action before Plaintiff was shot.  Ex. 3 (Arrington Dep. at 50-51).

17.    Detective Norris never saw anyone put handcuffs on Plaintiff, and has no idea whether Plaintiff was ever handcuffed.  Ex. 1 (Norris Dep. at 62, 65).

18.    The Metropolitan Police Department conducted an investigation of the shooting on Pennsylvania Avenue and of Plaintiff.  On information and belief, Shorter has been indicted in connection with the Pennsylvania Avenue shooting.

19.    In the course of the investigation, MPD seized some of Plaintiff's property for evidence, some of which is available for Plaintiff to retrieve, and other of which is being held as evidence.  Ex. 6 (Lewis Dep. at 8-9).


<div style="margin-left: 30%;">

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


   /s/  Samuel C. Kaplan
SAMUEL C. KAPLAN (463350)
Assistant Deputy Attorney General


    /s/  Shana L. Frost
SHANA L. FROST (458021)
Assistant Attorney General
441 4th Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6534
Fax:  (202) 727-3625
shana.frost@dc.gov

</div>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
**DAVID ARRINGTON,**                      )
                                          )
          **Plaintiff,**                  )          **C.A. No. 07-0170 (RBW)**
                                          )
     **v.**                               )
                                          )
**DISTRICT OF COLUMBIA,** *et al.*,       )
                                          )
          **Defendants.**                 )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants District of Columbia ("District") and Metropolitan Police Department
("MPD") Detective Milton Norris, by and through their undersigned counsel and
pursuant to Fed. R. Civ. P. 56, respectfully request that the Court grant judgment in their
favor.  As explained herein, when the Court considers the undisputed material facts in the
light most favorable to Plaintiff, Plaintiff cannot prevail on any of the claims he has
asserted against the Defendants.  Thus, the Defendants are entitled to judgment as a
matter of law.

**I.      FACTUAL AND PROCEDURAL BACKGROUND**

On August 25, 2006, Detective Milton Norris was in an unmarked MPD cruiser
traveling eastbound on Pennsylvania Avenue, SE when he heard approximately three
gunshots to his right.  Defendants' Statement of Undisputed Material Facts ("Defs.'
Stmt.") ¶ 1.  Detective Norris looked over towards where he heard the shots coming from
and saw an individual later identified as Dwayne Shorter walking down the street holding
a 9 mm handgun.  Defs.' Stmt. ¶ 2.  Detective Norris observed Shorter walk eastbound on

Pennsylvania Avenue with the gun in his right hand, and then turn right towards L'Enfant Square, SE.  Defs.' Stmt. ¶ 3.  Detective Norris momentarily lost sight of Shorter, and turned onto Minnesota Avenue, SE, which was the direction in which Shorter was heading.  Defs' Stmt. ¶ 4.  Detective Norris spotted Shorter on the next block, walking westbound on Nicholson Street, SE.  Defs.' Stmt. ¶ 4.

Detective Norris turned right onto Nicholson Street and pulled up alongside of Shorter.  Defs.' Stmt. ¶ 5.  In addition to having the police light in his unmarked cruiser activated, Detective Norris identified himself to Shorter as a police officer and told Shorter to stop and that he wanted to talk to him.  Defs.' Stmt. ¶ 6.  Believing Shorter to still be armed, Detective Norris unholstered his service weapon.  Defs.' Stmt. ¶ 7.  Shorter ignored Detective Norris' command to stop, and began to run westbound on Nicholson, turning left into an alley running parallel between Minnesota Avenue and Prout Street, SE.  Defs.' Stmt. ¶ 7.

Detective Norris exited his squad car and ran into the alley after Shorter.  Defs.' Stmt. ¶ 8.  As he was running, Shorter reached into the back if his pants, pulled out a handgun, and pointed it in the direction of Detective Norris.  Defs.' Stmt. ¶ 8.  Shorter fumbled with the gun and dropped it.  Defs.' Stmt. ¶ 9.  As Shorter stopped and reached for the gun, Detective Norris aimed his weapon at Shorter and ordered him to not pick up the gun.  Defs.' Stmt. ¶ 9.  Rather than comply with Detective Norris's command, Shorter reached down, picked up the gun, and again pointed it in Detective Norris's direction. Defs.' Stmt. ¶ 10.  Detective Norris, believing that Shorter was going to shoot him, fired one shot from his service revolver at Shorter.  Defs.' Stmt. ¶¶ 11-12.  The round,

however, hit Plaintiff, who was further down the alley and not seen by Detective Norris until after the shot was fired.  Defs.' Stmt. ¶ 12.

At the time of the shooting on Pennsylvania Avenue, Plaintiff was walking through the alley to go to a pizza shop.  Defs.' Stmt. ¶ 12.  Plaintiff heard the gunshots from Pennsylvania Avenue, but decided to continue on his way through the alley when he observed two individuals running towards him.  Defs.' Stmt. ¶ 13.  Plaintiff heard one of the individuals say "freeze," and then heard a gunshot.  Defs.' Stmt. ¶ 13.  Plaintiff also saw the individual being chased by the officer drop a gun.  Defs.' Stmt. ¶ 9.[2]

When Plaintiff heard one of the individuals say "freeze," he turned away from the two individuals to run in the other direction.  Defs.' Stmt. ¶ 14.  Plaintiff stated that he did not know whether or not the person was going to pick up the gun and shoot him.  Defs.' Stmt. ¶ 14.  It is Plaintiff's belief that Detective Norris was shooting at the person that had the gun, and that Detective Norris did not intentionally shoot him.  Defs.' Stmt. ¶ 15.  Plaintiff admits that Detective Norris never addressed him or ordered him to take any action before Plaintiff was shot.  Defs.' Stmt. ¶ 16.

After the shooting, Plaintiff was taken to George Washington University Hospital for treatment.  Ex. 3 (Arrington Dep. at 52).  Plaintiff claims he was handcuffed while transported to the hospital, and that the handcuffs were removed at some point after he arrived.  The Metropolitan Police Department conducted an investigation of the shootings on Pennsylvania Avenue and of Plaintiff.  On information and belief, Shorter has been indicted in connection with the Pennsylvania Avenue shooting.  In the course of the investigation, MPD seized some of Plaintiff's property for evidence, some of which is,

---

[2] In his responses to Interrogatories, Plaintiff adopted this statement as "the most accurate description of the subject shooting that Plaintiff has given at any time."  *See* Ex. 5 (Pl.'s July 25, 2008 Supp. Interrogatory Resp.).

and always has been, available for Plaintiff to retrieve, and other property that is being

held as evidence.  Defs.' Stmt.¶ 19.

Plaintiff originally filed the above-captioned matter on January 24, 2007 against

the District, former Chief of Police Charles Ramsey, MPD Detective Dan Lewis and

unknown members of the MPD.  In his original complaint, Plaintiff alleged (1) civil

rights violation; (2) denial of due process; (3) assault and battery; (4) intentional

infliction of emotional distress; (5) abuse of process; (6) trespass to chattel; (7)

conversion; (8) interference with prospective advantage; (9) outrageous conduct; and (10)

gross negligence.  *See generally* Compl.  The Defendants filed a Motion to Dismiss

and/or for Summary Judgment on March 15, 2007.  Plaintiff filed a response indicating

that he did not oppose the Defendants' Motion, and thereafter filed an Amended

Complaint against only the District and Detective Milton Norris.

In his Amended Complaint, Plaintiff asserted causes of action against the District

and Detective Norris for violation of civil rights pursuant to 42 U.S.C. § 1983, intentional

infliction of emotional distress, assault and battery, conversion, and false imprisonment.

*See generally* Am. Compl.  All of these causes of action involve intentional wrongdoing

on the part of the District and Detective Norris.  As explained below, the undisputed

material facts do not establish any intentional wrongdoing by the Defendants; thus, the

District and Detective Norris are entitled to judgment as a matter of law.

## II.     STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary

judgment:

> [S]hall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any,

> show that there is no genuine issue as to any material fact and that the
> movant is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The moving party in a motion for summary judgment bears the

initial burden of identifying evidence that demonstrates that there is no genuine issue of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once a movant has made the required showing under the rule, the burden shifts

to the opposing party to "come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587,

(1986).  In other words, "once the movant has supported a summary judgment motion by

evidence of particular events, the court may properly look to the nonmovant for rebuttal

evidence either 'from persons familiar with the events,'" or require "the nonmovant to

'otherwise cast more than metaphysical doubt on the credibility of the testimony.'" *Doe

v. Gates*, 981 F.2d 1316, 1323 (D.C. Cir. 1993) (quoting *Bias v. Advance Int'l, Inc.*, 905

F.2d 1558, 1561 (D.C. Cir. 1990)).

A trial court should enter summary judgment against a nonmoving party who fails

to make a showing sufficient to establish the existence of an element essential to his case,

and on which the party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.

As demonstrated below, Plaintiff cannot make a sufficient evidentiary showing to prove

any of his claims against the District or Detective Norris.  Thus, judgment in favor of the

Defendants is appropriate.

### III.    ARGUMENT

#### A.  The Undisputed Material Facts Demonstrate That Plaintiff Cannot Prevail on His Claims of Violation of Civil Rights

##### 1.   Plaintiff Cannot Demonstrate That the District of Columbia Violated His Civil Rights

In support of his Section 1983 claim against the District, Plaintiff alleges that the District of Columbia maintains a policy, practice or custom of failing to adequately train employees regarding citizens' rights, and of failing to supervise, sanction, or discipline its employees.  Am. Compl. ¶¶ 29-31.  Plaintiff further claims that the District maintains "inadequate internal affairs and citizen complaint procedures."  Am. Compl. ¶ 32. Plaintiff summarily concludes that these purported policies, practices and customs constitute deliberate indifference on the part of the District.  Am. Compl. ¶¶ 29-32.

It is well-settled that "Congress did not intend municipalities to be held liable [for constitutional torts pursuant to § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 691 (1978) (rejecting liability for municipalities and municipal officials under *respondeat superior* theory).  Therefore, Section 1983 represents the vehicle that a party must use in order to assert a claim against a municipality for an alleged violation of constitutional rights.

To prove a Section 1983 claim that meets the *Monell* requirements, Plaintiff must show that the municipality adopted an unconstitutional policy, such as a statute or regulation, that violates the constitutional rights of the individual, *Monell*, 436 U.S. at 694, or a practice "so permanent and well settled as to constitute a 'custom or usage' with

the force of law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970).[3]  A

plaintiff may also establish a *de facto* municipal policy by showing an unconstitutional

decision or action taken by an official policymaker of the municipality.  *Pembaur v. City

of Cincinatti*, 475 U.S. 469, 480-81 (1986).  In order to support such a claim, the Plaintiff

must demonstrate the existence of an official decision maker with "final authority to

establish municipal policy with respect to the action ordered."  *Id.* at 481.

In their Interrogatories, Defendants explicitly asked Plaintiff whether he

contended that his constitutional rights were violated as a result of the deliberate

indifference on the part of policymakers in the District of Columbia and/or the

Metropolitan Police Department.  Ex. 7 (Defs.' Interrogatory No. 14).  Specifically,

Defendants asked:

> Do you contend that your constitutional rights were violated as a result of
> the deliberate indifference on the part of policymakers in the District of
> Columbia and/or the Metropolitan Police Department to a pervasive
> custom or practice of violating citizens rights on the part of employees of
> the Metropolitan Police Department?  If the answer is yes:
> A.    Identify the policymaker(s).
> B.    Describe the persistent and pervasive custom or practice.
> C.    Identify and describe any and all incidents upon which you rely to
>        support such allegations.
> D.    Identify all witnesses who you contend support such a claim and
>        summarize the information possessed by each witness that supports
>        such a claim.

Ex. 7 (Defs.' Interrogatory No. 14).

Plaintiff responded by objecting that the question "seeks Plaintiff's mental

impressions, trial strategies and work product."  Ex. 7 (Pl.'s Resp. to Interrogatory No.

14).  Plaintiff also referred Defendants to his response to Interrogatory No. 2, where

---

[3] In this case, Plaintiff cannot base his Section 1983 claim on an actual unconstitutional statute or policy as
Plaintiff has admitted that he could not "[i]dentify any statutes, regulations and/or orders of the District of
Columbia that [he claimed] are evidence of an unconstitutional custom and/or policy on the part of the
District of Columbia."  Ex. 8 (Pl.'s June 27, 2008 Supp. Answers to Defs.' Interrogatory No. 16).

Plaintiff was asked to describe in detail how the shooting incident occurred. Ex. 7 (Pl.'s Resp. to Interrogatory No. 2). In response to that Interrogatory, Plaintiff referred to a recorded statement he gave to an investigator of MPD's Force Investigation Team soon after the shooting, as well as a written summary of the statement. Ex. 7 (Pl.'s Resp. to Interrogatory No. 2); *see also* Ex. 4 (Arrington Statement). Plaintiff also stated that MPD officers "seized Plaintiff's property (watch, sneakers, cell phone, car keys, and $5) and have refused to return them to Plaintiff despite being fully aware that Plaintiff is not a suspect in relation to the subject occurrence." *Id.*

Because Plaintiff's answer to Defendants' Interrogatory number 14 was clearly non-responsive in that he did not identify a policymaker, a practice, any incident aside from his own, or any witnesses, counsel for Defendants wrote to Plaintiff's counsel and explained that Plaintiff's objection that the interrogatory seeks "Plaintiff's mental impressions, trial strategies and work-product" was not valid as such privileges are not applicable to Plaintiff's thought processes, and requested that Plaintiff fully respond to the Interrogatory. Ex. 9 (May 22, 2008 Letter from S. Frost to A. Johnson). In response, Plaintiff served the District with Supplemental Interrogatory responses on June 27, 2008, where, in response to Interrogatory 14, Plaintiff again referred to his recorded statement, and stated that he "will supplement this Answer upon receipt of additional discovery from Defendants." Ex. 8 (Pl.'s June 27, 2008 Supp. Responses to Interrogatories). In his supplemental response, Plaintiff once again did not identify a policymaker, a practice, or any incidents he relied upon to support his claim aside from his own incident, or any witnesses to support his claim. Plaintiff has not supplemented his response to this Interrogatory since his June 27th responses.

It is clear that Plaintiff cannot prove his constitutional claims against the District based on a theory of unconstitutional *de facto* policies or the deliberate indifference of policymakers. First, to prove his claim, Plaintiff must "show fault on the part of the city based on a course its policymakers consciously chose to pursue." *Triplett v. District of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997); (*citing Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986)). Plaintiff has no evidence to meet this standard. Instead, Plaintiff has simply asserted that an undefined "policy" existed, but offers no evidence to support the assertion made in his Amended Complaint.

Courts in this jurisdiction require far more specific evidence to permit a plaintiff to present a Section 1983 claim against the District of Columbia to a jury. In fact, in *Carter,* the D.C. Circuit found statistical evidence introduced to show that "complaints of police brutality would languish at the MPD, so that officers could act in derogation of constitutional rights without fear of sanction" to be insufficient as the statistical evidence was "too general to prove any pattern or policy, and their specific instances were too scattered and lacking in detail to build a case." *Carter,* 795 F.2d at 123-24; *cf. Cox v. District of Columbia,* 821 F. Supp. 1, 14-16, nn. 15, 17 (D.D.C. 1993) (in lawsuit alleging § 1983 violation in excessive force case, the plaintiff "presented extremely detailed statistical evidence" in contrast to the "unconnected categories of statistics" adduced by the plaintiffs in *Carter*). Here, Plaintiff has not even offered the basic statistical evidence that the Court in *Carter* found to be lacking and instead has offered nothing beyond an allegation that such a policy exists. This is insufficient as a matter of law to survive summary judgment.

Second, Plaintiff has failed to provide any evidence in the discovery process that the District has a custom or policy of failing to discipline officer misconduct, or failing to conduct investigations of citizen complaints. Plaintiff's blanket assertion, without any documents, testimony, or other evidence, cannot withstand scrutiny at the summary judgment stage. *See Tafler v. District of Columbia,* 539 F. Supp. 2d 385, 392 (D.D.C. 2008) (plaintiff must provide evidence of a policy beyond mere allegations to survive the District's motion for summary judgment, rather than just making allegations) (citing *Sierra Club v. EPA*, 292 F.3d 895, 898-99 (D.C. Cir. 2002)).

A plaintiff may also attempt to prove his Section 1983 claim by demonstrating that the municipality was deliberately indifferent to an obvious need to train its employees. To satisfy such a standard, a plaintiff must provide evidence that officials knew or should have known of a specific training need, that failure to address that need was likely to result in violation of individual constitutional rights, and that the officials were deliberately indifferent to the need for such training. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

In this case, Plaintiff attempts to base his Section 1983 claim against the District on a theory of negligent hiring, training and supervision. Am. Compl. ¶¶ 26-27. In order for Plaintiff to rest his constitutional claim on an allegation that the District failed to train its officers, Plaintiff must show that officials were deliberately indifferent to a need to train so obvious that the failure to train in itself became a municipal policy. *City of Canton,* 489 U.S. at 389-90. The fact that one officer may not have been adequately trained is insufficient, in and of itself, to impose liability on the District. *Id.* at 390-91. Rather, Plaintiff must show that officers "so often violate constitutional rights that the

need for further training must have been plainly obvious to the city policymakers." *Id.* at 390, n.10. Plaintiff has simply made an allegation not supported by any evidence.

Moreover, Plaintiff must prove that the deliberate indifference to the need to train actually caused the constitutional injury in question. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985). Plaintiff's burden in this respect is significant; he must show that "*deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694; emphasis in original). "A showing of simple or even heightened negligence will not suffice" to establish municipal liability for constitutional torts. *Brown*, 520 U.S. at 407.

In their Interrogatories to Plaintiff, Defendants asked Plaintiff whether he "contended that [his] constitutional rights were violated as a result of the deliberate indifference on the part of the policymakers of the District of Columbia and/or the Metropolitan Police Department to a need for training and/or supervision of employees of the Metropolitan Police Department." Ex. 7 (Defs' Interrogatory No. 15). Defendants further asked Plaintiff that if he so contended, to identify the policymakers, describe in detail the training he contended was necessary to avoid violation of his rights, the incidents upon which he relied upon to support the contention of deliberate indifference to the need to train, and to identify witnesses. *Id.* Plaintiff responded by simply referring Defendants to his response to Interrogatory Number 2, which is cited above.

Here, the record is devoid of any showing that the District fails to adequately train its officers. Plaintiff has not identified any policymakers allegedly responsible for training, any particular training that was actually needed, any incidents other than his

own, or any witnesses to support his claim. Plaintiff also cannot demonstrate that any

deliberate action of the District is the moving force behind the alleged deprivation of

Plaintiff's rights. Thus, Plaintiff cannot prove his claim that the District violated any

Fourth Amendment rights afforded him, and judgment in favor of the District on

Plaintiff's constitutional claims is appropriate.

### 2. Plaintiff Cannot Demonstrate That Detective Norris Violated His Civil Rights

Plaintiff does not allege any specific claims against Detective Norris and instead

alleges generally that, "[a]s a direct and proximate cause of Defendants' actions, Plaintiff

was deprived of the rights, privileges, and immunities under the Fourth, Fifth, and

Fourteenth Amendments to the United States Constitution and the laws of the District of

Columbia." Am. Compl. ¶ 27. When examining the undisputed facts in the light most

favorable to Plaintiff, it is clear that Plaintiff cannot establish that Detective Norris

violated any constitutional right afforded by Plaintiff.

As a preliminary matter, Plaintiff cannot state a claim under either the Fifth or

Fourteenth Amendments. First, it is very well-settled that the Fourteenth Amendment

does not apply to the District of Columbia. The Due Process Clause of the Fourteenth

Amendment prohibits the *States* from depriving any person of life, liberty, or property

without due process of law. "Thus, by its terms, the Fourteenth Amendment applies only

to the States; it does not apply to the Federal Government or the District of Columbia."

*Powers-Bunce v. District of Columbia,* 479 F. Supp. 2d 146, 153 (D.D.C. 2007), citing

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 543 n.21

(1987); *see also Bolling v. Sharpe*, 347 U.S. 497, 498 (1954) (holding that the Fourteenth

Amendment does not apply to the District of Columbia).

Second, the Fifth Amendment is inapplicable to this case as Plaintiff's civil rights allegations are grounded in the assault and battery claim, *i.e.* Detective Norris's shooting of Plaintiff.  Hence, such a claim is more properly analyzed under the Fourth Amendment.  The Supreme Court has expressly held that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."  *Albright v. Oliver*, 510 U.S. 266, 273 (1994).  Thus, "all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen must be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Accordingly, Plaintiff's claims must be analyzed under the Fourth Amendment and not the Fifth Amendment.

Courts that have considered the issue have soundly rejected the notion that an unintentional act can provide a basis for constitutional tort liability.  For example, in *Dodd v. City of Norwich,* 827 F.2d 1 (2d Cir. 1987), *cert. denied* 484 U.S. 1007 (1988), the Second Circuit explained:

> The fourth amendment . . . only protects individuals against "unreasonable" seizures, not seizures conducted in a "negligent" manner. The Supreme Court has not yet extended liability under the fourth amendment to include negligence claims.  Only claims involving intentional conduct have been considered by the Supreme Court. Negligence, in fact, has been explicitly rejected as a basis for liability under the Fourteenth Amendment.

*Dodd,* 827 F.2d at 7-8 (citations omitted); *accord Baker v. McCollan*, 443 U.S. 137 (1979) (Section 1983 "imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law.").

Other courts have reached similar conclusions.  *See Brice v. City of York,* 528 F. Supp. 2d 504, 512 (M.D. Pa. 2007) ("the desideratum of an excessive force claim is a volitional act.  An accidental shooting by police fails to constitute a seizure as a matter of law and is therefore not compensable under the Fourth Amendment."); *Owl v. Robertson,* 79 F. Supp. 2d 1104, 1114 (D. Neb. 2000) ("the Fourth Amendment protects citizens against willful shootings and not accidental, but otherwise reasonable, ones."); *Clark v. Buchko,* 936 F. Supp. 212, 219-220 (D.N.J. 1996) (a Fourth Amendment claim for accidental shootings was inappropriate if "the officer[] lacked intent to seize the victims by firing the guns."); *Troublefield v. City of Harrisburg,* 789 F. Supp. 160, 166 (M.D. Pa. 1992) (because plaintiff "was injured by a bullet fired by accident, no fourth amendment rights have been trampled upon because [the officer] did not intend to bring plaintiff within his control or to, perhaps, settle him down were he struggling to break free.").

As a result, various courts have held that the same operative facts that form the basis for Plaintiff's claim – *i.e.,* the accidental shooting of a bystander when the shot was fired at an assailant – cannot support a Fourth Amendment claim.  For example, in a case that is similar to the one at bar where the victim/plaintiff was accidentally shot by a bullet fired by police at an assailant, the Second Circuit held that there could be no liability under the Fourth Amendment.  *Medeiros v. O'Connell,* 150 F.3d 164, 169 (2d Cir. 1998).  The *Medeiros* Court observed that "where the hostage is hit by a bullet intended for the hostage-taker, the mishap is the 'unintended consequence[] of government action,' and the governing principle is that such consequences cannot "form the basis for a fourth amendment violation."  *Id.* (quoting *Ansley v. Heinrich*, 925 F.2d 1339, 1344 (11th Cir. 1991)); *see also City of El Centro v. United States*, 922 F.2d 816, 822 (Fed. Cir. 1990),

14

*cert. denied*, 501 U.S. 1230 (1991).  The *Medeiros* Court concluded that "[t]he deflection of the bullet intended for [the assailant] did not transform the troopers' rescue efforts on the hostages' behalf into a seizure."  *Id.*

Here, it is undisputed that Detective Norris did not see the Plaintiff when he discharged his gun, and that Detective Norris's shooting of Plaintiff was accidental.  *See* Defs.' Stmt. ¶ 15.  Accordingly, there can be no liability for the violation of Plaintiff's constitutional rights for any negligent act on the part of Detective Norris.

### 3.  Even If Plaintiff Can Prove That Detective Norris Violated His Constitutional Rights, Detective Norris Is Entitled to Qualified Immunity

It is well-settled that government officials enjoy a qualified immunity from constitutional and statutory claims against them.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002).  Qualified immunity protects governmental employees against insubstantial lawsuits which, the Supreme Court has noted, lead to several societal costs, such as the expense of litigation, diversion of official energy from pressing public issues, deterrence of able citizens from acceptance of public office, and the possibility that the fear of being sued will dampen the ardor of all but the most resolute individuals.  *Harlow v. Fitzgerald*, 457 U.S. 800, 8l4 (l982).

Here, even if Plaintiff could allege a constitutional violation, Detective Norris is entitled to qualified immunity, and the constitutional claims against him should be dismissed.  According to the Supreme Court's decision in *Saucier*, a state actor cannot be held personally liable for conduct he or she would not have reasonably known was unconstitutional.  533 U.S. at 2002.  Specifically, the Supreme Court emphasized that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*

A police officer should prevail on the qualified immunity defense even if he is mistaken, if a reasonable officer could have believed that the action taken was not in violation of clearly established constitutional law. *Anderson v. Creighton*, 483 U.S. 635, 638 (l987). A police officer therefore should prevail on a claim of qualified immunity if a reasonable police officer possessing the same information could have believed that his conduct was lawful.

Here, the undisputed material facts demonstrate that Detective Norris discharged his weapon at a suspected felon who was pointing his gun at Detective Norris, and who Detective Norris had reason to believe had just shot another individual. Defs.' Stmt. ¶¶1-2, 9-11. The belief that such conduct was constitutional was clearly reasonable particularly in light of (1) cases stating that an officer has the right to self defense where he reasonably fears that death or serious bodily injury is imminent;[4] and (2) the cases cited in the previous section which establish that the accidental shooting of another in these circumstances does not violate the Constitution. Under these circumstances, Detective Norris was entitled to discharge his weapon at Shorter. Detective Norris testified that when Shorter picked up the gun and pointed it in his direction, he reasonably believed that Shorter intended to shoot him, thereby causing him death or serious bodily harm. Defs.' Stmt ¶¶ 10-11. Detective Norris also believed that Shorter had just shot another individual, as Detective Norris witnessed Shorter walking away from a shooting scene holding a gun in his hand. Defs.' Stmt. ¶¶ 1-2. Thus, a reasonable police officer in

---

[4] *See Etheridge v. District of Columbia,* 625 A.2d 908, 916 (D.C. 1993) (person may use self defense where he or she has a reasonable belief of danger of bodily harm); *United States v. Peterson,* 483 F.2d 1222, 1229-1232 (D.C. Cir. 1973) (discussing right to use deadly force in self defense).

Detective Norris's position would have been justified in discharging his weapon at Shorter; the fact that this act resulted in Plaintiff's injuries does not alter Detective Norris's right to qualified immunity.

### B. The Undisputed Material Facts Demonstrate That Plaintiff Cannot Prevail on His Common Law Tort Claims

As stated, Plaintiff has brought common law intentional tort claims of intentional infliction of emotional distress, assault and battery, conversion, and false imprisonment against the District and Detective Norris. The undisputed material facts demonstrate that Plaintiff cannot establish the elements of these common law torts.

First, with regard to Plaintiff's claim of assault and battery, District of Columbia law defines an assault as "an *intentional* and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff." *Etheridge v. District of Columbia,* 635 A.2d 908, 916 (D.C. 1993) (emphasis added). A battery is defined as "an *intentional* act that causes a harmful or offensive bodily contact." *Id.* (emphasis added).

The undisputed material facts demonstrate that Detective Norris did not intentionally harm the Plaintiff. Plaintiff testified that he does not believe that Detective Norris shot him on purpose. Defs.' Stmt ¶ 15. Detective Norris also testified that he did not see Plaintiff until after he discharged his weapon. Defs.' Stmt. ¶ 12. Thus, it is undisputed that Detective Norris did not intentionally intend to harm Plaintiff.

Nor does the doctrine of "transferred intent" provide any support for Plaintiff's claim. Under this theory, a defendant can be liable to a plaintiff for assault if the defendant intended to threaten or cause physical harm to a third person, and in doing so caused imminent apprehension of harm to the plaintiff. *See Holder v. District of Columbia,* 700 A.2d 738, 740 (D.C. 1997). Similarly, "[a] battery can occur even though

17

the person committing it did not intend to touch the victim; it is sufficient if the touching

is aimed or directed at another person and, as a consequence, the victim is touched."

D.C. Standard Jury Instruction 19-4; *see also Holder,* 700 A.2d at 740.

Both of these theories are, however, subject to well-settled District of Columbia

law that permits a police officer to use reasonable force in carrying out his duties,

"provided that the means are not 'in excess of those which the actor reasonably believes

to be necessary.'"  *Holder,* 700 A.2d at 741 (quoting *Etheridge,* 635 A.2d at 916); *see*

*also Smith v. District of Columbia,* 882 A.2d 778, 787 (D.C. 2005); *Jackson v. District of*

*Columbia,* 412 A.2d 948, 955-56 (D.C. 1980).  When determining whether the privilege

applies, the circumstances must be considered from the perspective of the officer.

*Etheridge,* 635 A.2d at 916 (citing *Graham,* 490 U.S. at 396-97).

Additionally, Section 207.2 of Title 6A of the District of Columbia Municipal

Regulations provides, in pertinent part, as follows:

> No member of the Metropolitan Police Force shall discharge a firearm in
> the performance of police duties except under the following
> circumstances:
> (a) To defend himself or another from an attack which the officer has
>     reasonable cause to believe could result in death or serious bodily
>     injury;
> (b) To effect the arrest or to prevent the escape, when every other means
>     of effecting the arrest or preventing the escape has been exhausted, of
>     a person who has committed a felony or has attempted to commit a
>     felony in the police officer's presence, or when a felony has been
>     committed and the police officer has reasonable grounds to believe the
>     person he or she is attempting to apprehend committed the felony;
>     Provided, that the felony for which the arrest is sought involved an
>     actual or threatened attack which the officer has reasonable cause to
>     believe could result in death or serious bodily injury; and provided
>     further, that the lives of innocent persons will not be endangered if the
>     officer uses his or her firearm. . . .

D.C. Mun. Reg. § 6A-207.2.

Under both the caselaw and the regulations, Detective Norris's actions were justified. It is undisputed that Detective Norris was chasing a suspect that he believed had just shot someone. Detective Norris had just heard the shooting, and saw Shorter walking down the street holding a gun. Defs.' Stmt. ¶¶ 1-2. When Detective Norris approached Shorter, he asked him to stop; Shorter ignored Detective Norris's police commands to stop. Defs.' Stmt. ¶¶ 6-7. While fleeing, Shorter pulled out a gun. Defs.' Stmt. ¶ 8. Both Plaintiff and Detective Norris observed Shorter drop the gun. Defs.' Stmt. ¶ 9. Shorter then picked up the gun and pointed it at Detective Norris, making Detective Norris fear he was going to be shot. Defs.' Stmt. ¶¶ 10-11. Plaintiff, who testified that when he saw Shorter drop the gun, he turned and ran in the other direction, was facing away from Shorter and Detective Norris when Shorter pointed the gun at Detective Norris. Defs.' Stmt. ¶ 14. Thus, it is undisputed that Detective Norris fired his weapon at an individual that was pointing a gun at him and therefore threatening his life. It is also undisputed that Detective Norris had reason to believe that Shorter was a fleeing, violent felon who refused to comply with police commands to stop. Detective Norris had no reason to believe that anyone would be endangered if Detective Norris resorted to use of his firearm to stop a fleeing felon as it is undisputed that Detective Norris did not see Plaintiff in the alley before firing his weapon. Defs.' Stmt. ¶ 12. Thus, Detective Norris was privileged in his use of force.

Plaintiff's claim for conversion also fails in light of the undisputed material facts. A cause of action for the tort of conversion requires an unlawful exercise of ownership, dominion and control over the personalty of another in denial or repudiation of his right to such property. *Blanker v. Harris, Upham & Co.*, 359 A.2d 281, 283 (D.C. 1976); *see*

*also Kaempe v. Myers*, 361 U.S. App. D.C. 335, 367 F.3d 958, 964 (D.C. Cir. 2004)

(citing *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956)).  Plaintiff appears to contend that

the property that was allegedly converted consists of keys, a cell phone, some clothing,

and $5.00.  Plaintiff's keys are and have been available to Plaintiff to retrieve at any time.

Defs.' Stmt. ¶ 19.  Plaintiff's clothing is being held as evidence.  Defs.' Stmt. ¶ 19.

Defendants are unaware of any money Plaintiff claims to have had.

Plaintiff's cell phone was seized pursuant to a valid search warrant.  *See* Ex. 10

(search warrant).  The warrant expressly describes Plaintiff's cell phone by make, model

number, serial number and phone number, and includes a return indicating the property

taken pursuant to the warrant.  Thus, Plaintiff cannot reasonably contend that the seizure

and retention of any of his property was unlawful.  Thus, the undisputed material facts

demonstrate that Plaintiff's conversion claim must be dismissed.

Defendants are also entitled to judgment on Plaintiff's claim of false

imprisonment.  While Plaintiff pleads no specific allegations in support of this claim, *see*

Am. Compl. ¶¶ 48-50, it appears that Plaintiff rests his claim on the fact that he was shot

and then handcuffed while taken to the hospital.  As explained above, the shooting itself

cannot form the basis of a false imprisonment claim as the tort requires the intentional

and unlawful arrest of another.  *Dent v. May Dep't Stores Co.,* 459 A.2d 1042, 1044

(D.C. 1982).[5]  Detective Norris's shooting of Plaintiff was neither intentional nor

unlawful.

The handcuffing of Plaintiff was also not unlawful under the circumstances.  "In

determining whether particular conduct constitutes false arrest or imprisonment it is not

---

[5] The District of Columbia Court of Appeals has noted that "[a]s a practical matter . . . there appears to be no real difference between false arrest and false imprisonment."  *Dent*, 459 A.2d at 1044 n.2; citing *Shaw v. May Dep't Stores Co.,* 268 A.2d 607, 609 n.2 (D.C. 1970).

the subjective state of mind of the plaintiff but, rather, the 'actions or words of the defendant [which] must at least furnish a basis for a *reasonable* apprehension of present confinement.'" *Id.* (quoting *Marshall v. District of Columbia,* 391 A.2d 1374, 1380 (D.C. 1978)).  First, it is undisputed that Detective Norris did not handcuff Plaintiff; indeed Detective Norris does not even know whether Plaintiff was placed in handcuffs. Defs.' Stmt ¶ 17.  Any officer that did handcuff Plaintiff likely did so in accordance with MPD General Order 502.1, which pertains to transportation of prisoners and requires that prisoners be handcuffed while transported.[6]  Because Plaintiff was shot by a police officer that was chasing a fleeing felon, it is reasonable that other officers called upon to transport Plaintiff believed that Plaintiff was involved in criminal activity and needed to be secured for Plaintiff's safety and the safety of others.  Moreover, all that is required is a reasonable belief on the part of the officers that Plaintiff may have been involved in criminal activity; probable cause in the constitutional sense is not required.  *Etheridge,* 635 A.2d at 918; *District of Columbia v. Murphy,* 631 A.2d 34, 36-37 (D.C. 1993).  The District submits, based upon the undisputed material facts, any officer that handcuffed Plaintiff would have been justified in doing so based upon the fact that Plaintiff was caught in the fire of an officer shooting at a fleeing felon who had threatened the officer's life.

Finally, with respect to Plaintiff's claim of intentional infliction of emotional distress, in order to establish his claim Plaintiff must show that Defendants (1) engaged in extreme and outrageous conduct that (2) intentionally or recklessly (3) caused him severe emotional distress.  *Gregg v. Hay-Adams Hotel*, 942 F. Supp. 1, 10 (D.D.C. 1996), citing *King v. Kidd*, 640 A.2d 656, 667-68 (D.C. 1993); *see also Bernstein v. Fernandez*, 649

---

[6] Plaintiff has not identified the officer that handcuffed him.

A.2d 1064, 1075 (D.C. 1991).  There is no general duty of care to avoid causing mental distress, and liability is not imposed for all conduct that causes mental distress.  *See Duncan v. Children's Nat. Medical Center*, 702 A.2d 207, 211 (D.C. 1997).  Liability is imposed only when the conduct goes "beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community."  *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980) (quoting Restatement (Second) of Torts § 46 cmt. d. n21 (1965)); *Rogala v. District of Columbia, et al.*, 161 F.3d 44 (D.C. Cir. 1998).  As the United States Court of Appeals for the District of Columbia Circuit stated in *Browning v. Clinton*, 292 F.3d 235, 240-249, (D.C. Cir. 2002), a claim for intentional infliction of emotion distress "is reserved for truly outrageous conduct."  This very demanding standard is infrequently met.  *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 186 (D.D.C. 1997).

Here, there is no evidence in the record to show extreme or outrageous conduct on the part of the Defendants.  The undisputed material facts demonstrate that Plaintiff was accidentally shot by Detective Norris who fired his weapon in self-defense at a fleeing felon.  Detective Norris's actions were not only not extreme or outrageous, as demonstrated above, they were legally justified.  A police officer acting in self defense by shooting at an individual aiming a weapon at him that the officer had reason to believe had just shot another person does not go "beyond all possible bounds of decency," nor can be "regarded as atrocious and utterly intolerable in a civilized community."  *Waldron*, 415 A.2d at 1076.

### C. In the Alternative, the Court Should Decline to Exercise Supplemental Jurisdiction Over Plaintiff's Common Law Claims

Because the undisputed material facts demonstrate that Plaintiff cannot prove his constitutional claims, and notwithstanding Defendants' arguments that the facts cannot support Plaintiff's common law claims, should the Court determine that there is sufficient evidence for Plaintiff to proceed with his common law claims this Court should decline to exercise jurisdiction over such claims. Absent any constitutional or federal statutory claims, this Court can decline to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1368(c)(3). Furthermore, the Supreme Court has written that, once federal claims have been dismissed, a District Court *should* dismiss pendent state law claims.

In *Gaubert v. Gray*, the U.S. District Court dismissed the plaintiff's constitutional claims on the grounds of qualified immunity. 747 F. Supp. 40, 50 (D.D.C. 1990). Noting that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right," the court also dismissed the plaintiff's four common law claims. *Id.* Citing the Supreme Court's decision in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), the District Court wrote:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Gaubert*, 747 F. Supp. at 50; *see also Byrd v. District of Columbia,* 297 F. Supp. 2d 136 (D.D.C. 2003) (Huvelle, J.).

Here, Plaintiff lacks sufficient evidence to proceed with his constitutional claims. As such, in the interests of judicial economy, all common law claims also should be dismissed.

## IV.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that judgment be granted in their favor.

Respectfully submitted,

PETER J. NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

___/s/  Samuel C. Kaplan_____
SAMUEL C. KAPLAN (463350)
Assistant Deputy Attorney General

____/s/  Shana L. Frost_____
SHANA L. FROST (458021)
Assistant Attorney General
441 4th Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6534
Fax:  (202) 727-3625
shana.frost@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
OFFICE OF THE ATTORNEY GENERAL


þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ»
                                    °
DAVID ARRINGTON,                    °
                                    °
        Plaintiff,                  °
                                    °
v.                                  °    Case No.
                                    °
                                    °    07-0170 (RBW)
                                    °
DISTRICT OF COLUMBIA,               °
et al.                              °
                                    °
        Defendant.                  °
þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ¼


                        Tuesday,
                        July 1, 2008

DEPOSITION OF:

                MILTON NORRIS


called for examination by counsel for the

District of Columbia, pursuant to notice of

deposition, in the Office of the Attorney

General, 441 4th Street, N.W., Washington,

D.C., when were present on behalf of the

respective parties:

2f300943-c2ae-497e-bbea-857f2cd38196

APPEARANCES:

On Behalf of the District of Columbia:

    SHANA FROST, ESQ.

Of:  D.C. Office of the Attorney
      General
      441 4th Street, N.W.

    Suite 600S

    Washington, D.C. 20001

    (202) 724-6534

    (202) 727-3625 fax

On Behalf of the Plaintiff:

    ANITHA JOHNSON, ESQ.

    OKIE C. WHITERU, ESQ.

Of:  Odelugo & Johnson, LLC

    6525 Belcrest Road

    Suite 612

    Hyattsville, MD  20782

    (301) 832-3020

2f300943-c2ae-497e-bbea-857f2cd38196

Page 26

1      you were doing immediately before this

2      incident?

3          A      Right.

4          Q      Okay.  And, were you alone?

5          A      Yes.

6          Q      Do you know where you were going,

7      or what your plans were?

8          A      I know I was going back to the

9      office, to my office.

10         Q      And, what time was it?  Well, let

11     me back up.  What is the first thing you heard

12     before this incident that made you suspect

13     something was wrong?

14         A      Gunshots.

15         Q      Gunshots.

16                Did you see anyone get shot?

17         A      No, I didn't actual see the

18     shooting.

19         Q      Did you see anyone holding a gun,

20     aiming it at anyone?

21         A      That's two questions.

22         Q      Okay.

2f300943-c2ae-497e-bbea-857f2cd38196

```
 1              A     I did see someone holding a gun.

 2              Q     Okay.

 3              A     Yes.

 4              Q     And, was he aiming the gun when

 5      you first saw him?

 6              A     No.

 7              Q     How did he have the gun when you

 8      first saw him?

 9              A     He had it in his hand walking with

10      it.

11              Q     So, he had it just pointed out,

12      walking?

13              A     Yes.

14              Q     He didn't have his hand down to

15      his side?

16              A     Yes, it was somewhere down to his

17      side, maybe to his waist area, just walking

18      with the gun.

19              Q     Okay.  And --

20              A     Black 9 mm handgun.

21              Q     And, what time was that around?

22              A     It may have been some time around
```

2f300943-c2ae-497e-bbea-857f2cd38196

1              BY MS. JOHNSON:

2        Q    I was asking you, you stated that

3   you saw an individual holding a gun.

4        A    Right.

5        Q    And, I asked you after that what

6   happened?

7        A    After the gunshots, I looked and

8   saw other people running, and then he stood

9   out, because when he was walking down the

10  street people started to part ways with him

11  and the he walked away up Pennsylvania Avenue.

12       Q    Okay.  Do you know what type of

13  clothing was he wearing?

14       A    I did at the time, I don't recall

15  right now.

16       Q    Okay.  Was it dark clothing, or do

17  you recall whether the clothing was dark in

18  color?

19       A    It may have been, I'm not sure

20  right now.

21       Q    And, at that time, did you

22  dispatch any of your observations?

2f300943-c2ae-497e-bbea-857f2cd38196

1       we have in evidence, you saw that video, where

2       two individuals are running?

3            A     Right.

4            Q     Did that video appear to be Mr.

5       Shorter in that video?

6            A     I couldn't tell.

7            Q     Okay.  Did you recognize the other

8       person in that video?

9            A     No.

10           Q     No, okay.

11                 And, after you saw the -- you

12      waved to Officer Rimel to come on and follow

13      you, what happened?

14           A     Then I saw people running down, I

15      think that's Minnesota Avenue, down in that

16      area.

17           Q     Okay.

18           A     And, so I drove down to the next

19      block, which was Nicholson Street, and I

20      turned down, I made a right-hand turn onto

21      Nicholson Street.

22           Q     Okay.

2f300943-c2ae-497e-bbea-857f2cd38196

1          A     And, once I got onto that street,

2     I saw Mr. Shorter just crossing over the

3     street onto the opposite side.

4          Q     Okay.

5          A     Which would be the south side.

6          Q     Did you ever lose sight of Mr.

7     Shorter?

8          A     At some point, yes.

9          Q     For how long did you lose sight of

10    Mr. Shorter?

11         A     I'm not sure.  I would say a few

12    seconds.

13         Q     Okay.  And, when you regained

14    sight of Mr. Shorter, what happened after

15    that?

16         A     I, at that time, identified myself

17    to him, ordered him to stand still.  I know I

18    said some other things to him, I think I may

19    have said, can I talk to you for a minute or

20    something like that.  I'm not 100 percent

21    sure.

22               And, he refused, he kept walking,

2f300943-c2ae-497e-bbea-857f2cd38196

Page 39

1        and he knew I -- I can't say he knew I was the

2        police, but I did have my light in my window

3        and it was on.

4                Q    Okay.

5                A    And, I told him I was the police,

6        and he still refused to stop and kept

7        continuing to walk, and walk away from me.

8                Q    So, he was just walking at a

9        regular pace?

10               A    No, he was walking -- once you've

11       been doing this for a while, they give you

12       this demeanor like I'm going to run, and

13       that's the type of look that he gave.  And, as

14       soon as I opened up the door he took off and

15       started running.

16               Q    Okay.

17               MS. JOHNSON:  I'm going to mark

18       this as Exhibit 1 for identification.

19                            (Whereupon, the document

20                            was marked for

21                            identification as

22                            Exhibit No. 1.)

2f300943-c2ae-497e-bbea-857f2cd38196

Page 48

1        put an S right there.

2                Q       Okay.

3                A       And --

4                Q       So, the S marks where Mr. Shooter

5        --

6                A       Shorter.

7                Q       -- Shorter.

8                A       Right.

9                Q       Okay.

10               A       And, when I came, when I pulled up

11       beside him, I kind of pulled my car like right

12       here, right up beside him.  And, at that point

13       I made it real clear who I was, because I knew

14       he was armed.  So, when I told him who I was,

15       identified myself to him, told him to stop,

16       let me talk to you for a minute, he kept

17       walking.

18                       I think I told him again, let me

19       talk to you, stop, and he continued to walk,

20       but he was looking back at me.  And, at that

21       point I knew he was going to run.

22                       So, when I opened the door, before

2f300943-c2ae-497e-bbea-857f2cd38196

1    I even got out, he took off and started

2    running.  So, I got back in my car, he cut

3    right down this alley right here, and when I

4    got back in my car I pulled my car -- I

5    stopped my car somewhere right here,  and I

6    got out of my car and started chasing him.

7         Q    Okay.  Can you write alley on

8    here?  Is this the alley?  Can you just write

9    alley?

10        A    There's the alley.

11        Q    Okay.  Okay.  And, after you --

12   when you started chasing him -- oh, at what

13   point did you lose sight of him?

14        A    Over here.

15        Q    Where were you when you lost

16   sight?

17        A    At what point?

18        Q    Yes, at what point were you when

19   you lost sight of him?  Were you in vehicle,

20   where you couldn't see him?

21        A    Yes, I lost sight -- now, just --

22   I saw some people running down on Minnesota

2f300943-c2ae-497e-bbea-857f2cd38196

Page 50

1    Avenue at the time.  I thought it could have

2    been him.  That's what drew me to Nicholson

3    Street.

4              So, as I came down Nicholson

5    Street, so I lost sight of him somewhere right

6    here at one point, and then as I came down

7    Minnesota Avenue I still lost -- I still

8    didn't have sight of him.

9              MS. FROST:  When you say -- you

10   said you lost sight of him here, can you just

11   say where that is for the court reporter?

12             THE WITNESS:  Oh, I'm sorry,

13   somewhere, I think that's on L'Enfant Square,

14   and somewhere on Minnesota Avenue.

15             BY MS. JOHNSON:

16        Q    Okay.

17        A    And, I think that's the 2300

18   block, somewhere in that area.

19        Q    But, you were driving and he was

20   walking at that time?

21        A    Right.

22        Q    So, you only lost sight of him for

2f300943-c2ae-497e-bbea-857f2cd38196

Page 51

1          a short time, you said a few seconds earlier?

2              A      Yes, for a few seconds, because I

3      know I lost sight of him when I looked at

4      Rimel, because I wasn't looking in that

5      direction, because I was looking at him,

6      Sergeant Rimel.

7              Q      And, when you looked up again you

8      still saw him?

9              A      When I looked up again, I saw

10     people running down here on Minnesota Avenue.

11     At that point, I thought that it probably was

12     Dwayne.

13                   So then, at that point I drove

14     down Minnesota Avenue, and I made a right-hand

15     turn, then I seen some individuals turn down

16     on Nicholson Street.  And then, I turned down

17     on -- then I came and turned down on Nicholson

18     Street.

19             Q      Okay.

20             A      And then, when I got on Nicholson

21     Street, that's when I looked and saw him, saw

22     who I felt was the shooter, based on his face

2f300943-c2ae-497e-bbea-857f2cd38196

Page 52

1       and based on his clothing.

2               Q       Okay, and at that point he started

3       running?

4               A       No, not at -- no, he didn't start

5       running until I started talking with him.

6               Q       Okay.  So, prior to that he wasn't

7       running?

8               A       No, he was walking.

9               Q       And, do you know who the

10      individuals were who were running?

11              A       No.

12              Q       Okay.  And, going back to when you

13      first got out of your vehicle and saw him, can

14      you start from that point, what happened?

15              A       Well, I confronted him right here,

16      and there's a house right here, and while

17      talking to him, communicating with him, he

18      continued to walk away, after I told him to

19      stop.

20                      Then, when I opened my car door

21      that's when he ran.  I got in my car, I got

22      back in my car, drove to the mouth of the

2f300943-c2ae-497e-bbea-857f2cd38196

Page 53

1       alley.  I got out of my car, and, actually it

2       was really before the mouth of the alley.

3       But, I got out of my car.  When I got out of

4       my car I kind of like slowly went around that

5       corner, and when I went around that corner he

6       was about right here, running down the alley.

7            Q    Okay, when you got around the

8       corner, how far would you say Mr. Shorter was

9       to where you were, from the beginning of the

10      alley to how far Mr. Shorter had gotten in the

11      alley?

12           A    I'm not 100 percent sure.  The

13      only way I could it is to go back to the crime

14      scene and kind of -- kind of put it in my mind

15      about where he was out, and then do it from

16      that point.

17           Q    What about the light in there, how

18      was the lighting?

19           A    It was dark outside, but there was

20      a street light on in the alley.

21           Q    Okay.  Can you put a marking where

22      the street light may have been?  Is it in the

2f300943-c2ae-497e-bbea-857f2cd38196

Page 54

1      beginning or --

2            A      It was somewhere over here.

3            Q      How far was it from when you came

4      in the alley, how far was it?

5            A      The street light?

6            Q      Yes, how far was it from Mr.

7      Shorter?

8            A      Oh, he was like right underneath

9      it.

10           Q      Okay.  And, what happened after

11     that?

12           A      And, that's when I observed him

13     starting to reach in the back of his shirt, is

14     what he started. And, while he was doing that,

15     while he was reaching with both hands, he

16     started to go underneath of his shirt, and

17     that at that point I saw him trying to grab a

18     gun from underneath his shirt.

19           Q      Was that in the back?

20           A      Yes.

21           Q      Okay, so he was reaching in the

22     back of him.

2f300943-c2ae-497e-bbea-857f2cd38196

1          A     Right.

2          Q     He was using both hands?

3          A     Yes.

4          Q     And, he was also running?

5          A     Yes.

6          Q     Okay.  And, what happened after he

7     was reaching for his gun?

8          A     Well, at that point, he began to -

9     - he tried to take the gun out of his back.

10    While he was doing that, he didn't -- he

11    didn't have a firm grip on the gun.  He had a

12    difficult time trying to grab it, as I can

13    tell.

14               And then, at that point, the gun

15    started to point in my direction, and that's

16    when I was like, whoa, I kind of like stopped

17    in orbit.

18         Q     what do you mean when the gun

19    started pointing at your direction?

20         A     While he was trying to get the gun

21    out, it was -- at some point it had pointed in

22    my direction.

2f300943-c2ae-497e-bbea-857f2cd38196

Page 56

1          Q      Did he get it out and have it in

2     his hand and point it at you?

3          A      Well, it kind of happened real

4     quick.  He did manage to get it out, but as

5     soon as he got it out it fell right out of his

6     hands, because he was fumbling with the gun.

7          Q      Did it point in your direction

8     before it fell or after?

9          A      Right.

10         Q      Okay.

11         A      Before it fell.

12         Q      Okay.  So, it fell once, and then

13    what happened?

14         A      Then he stopped.  When he stopped,

15    right there I was like, this guy must be going

16    to shoot me.  He knows I'm the police.  I told

17    him I'm the police.  I yell out the alley

18    numerous times, police, stop, police, stop.

19              When that gun -- when he started

20    going for that gun, it just was me and him,

21    and I wasn't focusing on nobody else but him.

22    And, at that point, I'm like, my gosh, this

2f300943-c2ae-497e-bbea-857f2cd38196

Page 57

1          guy, when he stopped to bend down, I'm

2          thinking, he's going to shoot me.

3                  Q      And, how far were you from Mr.

4          Shorter at a time when he stopped?

5                  A      Maybe 30 feet or more.

6                  Q      Thirty feet.

7                         And, could you see him very well?

8                  A      Oh, yes.

9                  Q      And, did you see anyone else with

10         him?

11                 A      No.

12                 Q      Okay.  So, from the time when he

13         first started running on Nicholson Street, and

14         turned on in the alley, did you ever see

15         anybody with him?

16                 A      No.

17                 Q      And, how long a time lapsed

18         between the time when you first saw him and

19         you first fired your weapon?  I'm sorry, the

20         first time you started chasing him and you

21         first fired your weapon?

22                 A      Are you talking about when he was

2f300943-c2ae-497e-bbea-857f2cd38196

Page 58

1       on Nicholson Street?

2              Q      Yes.

3              A      Seconds, I would say seconds.

4              Q      Okay.  And, would you be able to

5       say how long the total pursuit with the

6       individual took?

7                     MS. FROST:  From what time to what

8       time?

9                     BY MS. JOHNSON:

10             Q      From the time you started pursuing

11      him, when you saw him on, was it Pennsylvania

12      Avenue?

13             A      Yes.  I don't know at the time, I

14      know I may have said that earlier in one of my

15      prior statements.  Whatever that time was

16      would be more fresh.

17             Q      Okay.

18             A      It's hard trying to do it now,

19      because things tend to go real, real fast.

20             Q      Okay. And, at the time you fired

21      your weapon, you were shooting at Mr., is it

22      Shorter?

2f300943-c2ae-497e-bbea-857f2cd38196

Page 59

1              A      Right.

2              Q      Okay. And, did you look to see if

3       anyone else was in the alley?

4              A      Well, when I looked down the alley

5       at him I didn't see anybody else. So --

6              Q      Did you yell a warning that you

7       were about to shoot?

8              A      No.

9              Q      And, after you discharged your

10      weapon, what happened?

11             A      He dropped the gun, that is, Mr.

12      Shorter, and continued to run south down the

13      alley.

14             Q      Okay.  So, he had picked it up

15      again.

16             A      Right.

17             Q      And, the second time he picked up

18      the gun, what did he do with the gun?

19             A      At that point, that's when he

20      pointed the gun at me.

21             Q      Okay.  So, he pointed it directly

22      at you, he never fired a shot?

2f300943-c2ae-497e-bbea-857f2cd38196

Page 60

```
 1          A      Right.

 2          Q      Okay.  How long did he point it at

 3      you?

 4          A      Maybe a second or so.

 5          Q      A second.

 6                 Is that when you fired your

 7      weapon?

 8          A      Right.

 9          Q      Okay.  And, what were you trying

10      to -- when you were shooting, what were you

11      aiming at?

12          A      Mr. Shorter.

13          Q      Anything specific you were aiming

14      at on him?

15          A      Just aiming at him.

16          Q      And, after you shot your weapon,

17      what happened?

18          A      Then I started to continue my

19      pursuit of Mr. Shorter, and then when I got

20      about right here, I got about right here,

21      that's when I heard somebody yell out, I'm

22      shot, you shot me, you shot me.
```

2f300943-c2ae-497e-bbea-857f2cd38196

Page 62

1       realized he was shot, so I came back and

2       rendered first aid to Mr. Arrington.

3                   And --

4           Q       And, what statements did Mr.

5       Arrington make?

6           A       The only thing that I heard him

7       say was that I shot him, or he'd been shot,

8       something like that.

9           Q       Did he ask you why did you shoot

10      me?

11          A       He didn't ask.

12          Q       Okay.  Was he placed in handcuffs?

13          A       I don't know if he was or not.

14          Q       And, who came -- how long did it

15      take for someone else to come to the scene?

16          A       Rimel came immediately.

17          Q       Immediately.

18          A       Sergeant Rimel.

19          Q       Within how long, minutes or

20      seconds?

21          A       I don't know.  I want to say

22      seconds, but when you are in a situation like

2f300943-c2ae-497e-bbea-857f2cd38196

Page 65

1          A     Oh, no, I was sure.

2          Q     Okay.  And, did you stay at the

3     scene until the ambulance came?

4          A     Yes.

5          Q     And, did you ever see anyone put

6     handcuffs on him?

7          A     No.

8          Q     You never --

9          A     As soon as other units responded

10    to the scene, they immediately took me to the

11    side, took me away.

12         Q     Okay.

13         A     So, I don't even recall seeing

14    them getting to an ambulance.

15         Q     Do you recall searching him or

16    touching him in any way?

17         A     I may have told him to sit still,

18    I mean, lay still, at that point.

19         Q     Okay.  Do you recall him making a

20    call on his phone, his cell phone?

21         A     No.

22         Q     You don't recall.  Okay.

2f300943-c2ae-497e-bbea-857f2cd38196

Page 68

1          A     Yes.

2          Q     And, did you accurately review all

3     the information in that document?

4          A     Not yet.

5          Q     Prior to signing it, did you

6     review it?

7          A     Yes.

8          Q     And, I'm going to show you Exhibit

9     4, which is titled, "Defendant Norris'

10    Responses."  This is marked as Exhibit 4, your

11    responses to omissions.  Do you recall

12    reviewing that document?

13         A     Yes.

14         Q     Okay.  And, did you sign the

15    document?

16         A     Yes.

17         Q     Okay.  And, at the time when you

18    saw Mr. Arrington on the floor, after being

19    shot, he wasn't your intended victim, was he?

20         A     No.

21         Q     And, you never aimed your gun at

22    him?

2f300943-c2ae-497e-bbea-857f2cd38196

Page 69

1          A      No.

2          Q      And, you admit that you did shoot

3    Mr. Arrington?

4          A      I guess I -- I have to admit to

5    it, since he was the only one in the alley

6    that received a gunshot wound.

7          Q      And --

8          A      Put it this way, I never saw him

9    being shot.

10          Q      -- and after the incident, you

11    state you may have searched him.

12          A      No, I didn't search him at all.

13          Q      Okay.  Do you recall any

14    conversations with Mr. Arrington after the

15    shot, after he was shot?

16          A      No, we didn't have a conversation.

17          Q      Did you say anything to him?

18          A      I don't think I did, no.  I may

19    have asked him questions in regards to where

20    he was shot at, where he was hit.

21          Q      Okay.  And, do you recall saying

22    anything else to him?

2f300943-c2ae-497e-bbea-857f2cd38196

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**METROPOLITAN POLICE DEPARTMENT**
**INVESTIGATIVE FILE REPORT**

P.D. 854 rev 7/76

| REPORT OF INVESTIGATION | DIVISION OPR | BRANCH FIT |
|---|---|---|

FILE TITLE: **Use of Service Pistol Investigation**

I.D. NO.

ARREST NO.

COMPLAINT NO. **06-117-060**

CASE NO. **FIT #S-M-I-06-403**

☐ ACTIVE ☐ CLOSED ☐ REQUESTED ACTION OTHER

☐ REQUESTED ACTION FROM ☐ OTHER

OTHER OFFICERS: **Det. Bryan Kasul**

CROSS FILE ☐☐☐☐☐

RELATED FILES

BY **Sgt. Ralph Wax**

UNIT **OPR/FIT**

DATE **August 25, 2006**

REPORT RE: **Interview of Detective Milton Norris**

On Friday, August 25, 2006, Superintendent of Detectives Division, Violent Crimes Branch Detective Milton Norris provided an audio taped statement to Force Investigation Team Sergeant Ralph Wax and Violent Crimes Branch Detective Bryan Kasul. The following is a summary of the interview:

Detective Norris stated that he driving an unmarked cruiser 3509, a blue Chevrolet Impala eastbound in the 2300 block of Pennsylvania Avenue, Southeast, and was stopped in traffic in the far left lane. It was there that Detective Norris heard approximately three gunshots to his right. Detective Norris looked to his right he observed a black male subject, approximately 5' 4", with a thin build, with long plats in his hair and wearing a hat, a black tee-shirt and black jean shorts. The subject had his back towards the east and was holding a black semi-automatic handgun in his right hand. Detective Norris observed citizens fleeing the area and saw another male subject holding his hands to his face, while the armed subject began backing up looking towards the first subject. The subject then turned around and walked eastbound behind the Metrobus stand with the gun in his right hand. As he passed, people at the bus stand raised their hands and allowed him to pass.

At this point Detective Norris came to the intersection of Pennsylvania Avenue and L'Enfant Square, Southeast. It was there that Detective Norris activated the emergency equipment on his cruiser to get around another vehicle and then he turned across the lanes of traffic to southbound Minnesota Avenue, Southeast. At that time Detective Norris observed a marked police cruiser drive past him. Detective Norris indicated that he was still able to focus on the armed subject, who had turned right towards L'Enfant Square, Southeast, and began jogging towards Minnesota Avenue, Southeast. Detective Norris observed the subject turn westbound into the 2300 block of Nicholson Street, Southeast. Detective Norris noted that he could not see the firearm at this point. Detective Norris related that he briefly lost sight of the suspect as he turned the corner onto Nicholson Street, Southeast.

Detective Norris activated the emergency lights on his cruiser and then turned southbound on Minnesota Avenue and then westbound into the 2300 block of Nicholson Street, Southeast. Detective Norris indicated that he only used the emergency lights and not the siren because he did not want to alert the suspect, but he wanted to get the attention of the officer in the marked cruiser to follow him. At that point

DISTRIBUTION:

SIGNATURE (Officer)

APPROVED (Name and title)

DATE 10/04/06

**OFFICIAL USE ONLY**

This report is the property of the Metropolitan Police Department. Neither it nor its contents may be disseminated outside the agency to which loaned.

Page 1 of 2

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**METROPOLITAN POLICE DEPARTMENT**
**INVESTIGATIVE FILE REPORT**

P.D. 854A Rev. 4/74

| REPORT OF INVESTIGATION (Continuation) | DATE August 25, 2006 | BRANCH |
|---|---|---|
| FILE TITLE Interview of Detective Milton Norris | | I.D. NUMBER |

Detective Norris observed the same armed subject crossing over the street towards the south sidewalk. Detective Norris drove up to the subject and stopped adjacent to him. Detective Norris drew his service pistol and placed it in his left hand (Detective Norris is right handed), while he maintained his right hand on the steering wheel. It was then that Detective Norris called out to the subject identifying himself as a police officer and directed the subject to display his hands and to raise them. The subject refused and continued walking. Detective Norris repeated his commands in a louder tone and the subject ignored him.

As Detective Norris opened the door to his cruiser to exit, the subject began running westbound on the south sidewalk of Nicholson Street, Southeast, and then southbound into the west alley of the 2300 block of Minnesota Avenue, Southeast. Detective Norris pursued the subject on foot into the alley. At that point Detective Norris observed the subject reach under his shirt into the back of his pants. The subject then pulled out black handgun from underneath his shirt with his right hand and turned slightly to his right and began pointing it Detective Norris' direction. Detective Norris called out *"Police, drop the gun!"* The gun then fell from the subject's hands to the ground. Detective Norris began to move towards the gun. However, the subject took one step, turned around and squatted down. Detective Norris yelled *"Don't do it! Don't do it!"* The subject then picked the gun up with his right hand and began raising it towards Detective Norris. Detective Norris said that he knew that the subject was picking up the gun to shoot him. At this time Detective Norris fired one round from his service pistol in fear for his life at the suspect. The suspect then dropped the gun and ran southbound in the alley and then turned westbound into the south alley of the 2300 block of Nicholson Street, Southeast, towards Prout Street, Southeast.

Detective Norris started to chase the subject and as he began to enter the south alley of the 2300 block of Nicholson Street, Southeast, he heard Mr. David Arrington, who was to Detective Norris' left, call out that he had been shot. Detective Norris looked and saw Mr. Arrington on the ground holding his leg, saying that he could not feel his leg. At that point Detective Norris stopped chasing the suspect and gave aid to Mr. Arrington and called 911 requesting that police and emergency medical personnel respond. Detective Norris stated that he never saw anyone else in the alley at the time of his discharge. Detective Norris was asked why he only fired one round at the suspect and he related that after he fired one round, the subject had dropped the weapon and ran away.

This report is the property of the Metropolitan Police Department
Neither it nor its contents may be disseminated outside the agency to which loaned.

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 1

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA

- - - - - - - - - - - - - - - x
DAVID ARRINGTON,                :
                               :
          Plaintiff,            :
                               :
      v.                        :
                               :   Civil Case No:
DISTRICT OF COLUMBIA, et        :   07-0170 (RBW)
al.,                            :
                               :
          Defendants.           :

- - - - - - - - - - - - - - - x

                    Monday, June 30, 2008
                    Washington, D.C.
Deposition of

          DAVID RYLAND ARRINGTON

the Plaintiff, called for examination by counsel for

the Defendants, pursuant to notice, held at the Office

of the Attorney General, 441 4th Street, N.W, 6th Floor

South, Washington, D.C., beginning at 10:15 a.m., before

Frances M. Freeman, a Notary Public in and for the

District of Columbia, when were present on behalf of

the respective parties:

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 2

1    APPEARANCES:

2        For the Plaintiff:

3            ANITHA W. JOHNSON, ESQUIRE
             Odelugo & Johnson, LLC
4            6525 Belcrest Road
             Suite 612
5            Hyattsville, Maryland  20782
             240/764-4160

6

7        For the Defendants:

8            SHANA L. FROST, ESQUIRE
             Office of the Attorney General
9            for the District of Columbia
             441 4th Street, N.W.
10           6th Floor South
             Washington, D.C.  20001
11           202/724-6534

12

13       Also Present:

14           OKIE C. WHITERU, ESQUIRE
             BENJAMIN RICHARDS

15

16

17

18

19

20

21

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 30

1      A   No, I -- I'm not sure either how many drinks

2   I had, but I wasn't -- I was functioning.  I was not

3   intoxicated all the way.

4      Q   Were you a little tipsy?

5      A   Tipsy, I have to say.

6      Q   Normally, for you, how many drinks does it

7   take to get you tipsy?

8      A   I'm not sure either.

9      Q   Had you been eating that day as well?

10     A   I ate earlier that day.

11     Q   Were you using any medication at the time?

12     A   No.

13     Q   Taking any other drugs?

14     A   No.

15     Q   Did there come a time when you were on your

16   way to Mario's Pizza that you heard any gunshots?

17     A   Yes.  I heard three gunshots.

18     Q   Let's see.  Can you draw a star where you

19   were on the map approximately when you heard the

20   gunshots?

21     A   (Witness complies).

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 31

1       Q    Is that right where the triangle was?

2       A    Yes.

3       Q    It is right where you stopped?

4       A    Yes.

5       Q    And the record will reflect that you have

6    gone about halfway through the alley towards Nicholson

7    Street when you stopped because you heard gunshots.

8    Is that correct?

9       A    Yes.

10      Q    And you said you heard about three gunshots?

11      A    Yes, I heard about three.

12      Q    And where did it sound like the gunshots were

13   coming from?

14      A    I had no idea.

15      Q    You couldn't tell?

16      A    No.  I'm not sure.

17      Q    After you heard the gunshots, what did you

18   do?

19      A    I stopped -- I stopped right there for a

20   minute.  But then I continued, but I didn't get far.

21   I didn't get far.

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 32

1      Q    Knowing that there were gunshots being fired

2    in the area, why didn't you turn back to your house or

3    to your girlfriend's house?

4      A    I just didn't.  I just didn't.

5      Q    So the gunshots didn't concern you?

6      A    No, they didn't concern me.

7      Q    So you started to continue on again, you

8    said?

9      A    Yes.  But I didn't get far.   Probably a

10   couple of steps or whatever.

11     Q    And then what happened?

12     A    I observed two individuals running towards

13   me.

14     Q    Can you describe those individuals?

15     A    I can't describe them.  I'm not sure what

16   they had on.  Because the alley was dark.  There was

17   not that much light in the alley.

18     Q    Do you know how many streetlights there were

19   -- were there any streetlights in the alley?

20     A    I know there is one light.  But it is dark,

21   it is dark in the alley.

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 33

| | | |
|---|---|---|
| 1 | Q | What time of day was this? |
| 2 | A | It was nighttime. |
| 3 | Q | Approximately what time? |
| 4 | A | I'm not sure what time it was. |
| 5 | Q | But it was dark? |
| 6 | A | It was dark. |
| 7 | Q | So you saw two people running toward the |
| 8 | alley? | |
| 9 | A | Yes. |
| 10 | Q | Or running in the alley? |
| 11 | A | Running towards, coming in the alley. |
| 12 | Q | Towards you? |
| 13 | A | Towards -- yeah.  In front of me. |
| 14 | Q | Did you see any cars? |
| 15 | A | I saw a police car, but... |
| 16 | Q | Where was the police car?  Can you show me on |
| 17 | the map? | |
| 18 | A | I saw a police car like -- it was right here, |
| 19 | but it pulled off.  It was on Nicholson Street in |
| 20 | front of the alley. |
| 21 | Q | At the mouth of the alley on Nicholson |

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 36

1    Q    So what did you do to get out of their way?

2    A    I stepped back, but I was heading -- trying

3    to go -- head back to my baby's -- I mean, my girl's,

4    my girlfriend's house.

5         And I didn't make it that far.  I took like a

6    couple steps.  I heard, Freeze.

7    Q    So at this point were you facing the mouth of

8    the alley towards Nicholson?

9    A    No, I'm sideways.

10   Q    So you are facing towards Prout Street, then?

11   A    I'm facing towards Nicholson, but my body is

12   facing towards -- my body is facing towards -- going

13   back this way, but I'm looking behind me.

14   Q    So you are turned around to see what was

15   going on --

16   A    Yes.  I'm sideways standing.

17   Q    So you heard someone say, Freeze?

18   A    Freeze.

19   Q    Did you hear anything else said?

20   A    No.

21   Q    Did you hear anyone identify themselves as a

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 39

1        Q    Between you and the people?

2        A    Yes.

3        Q    Who was closer to you, the person saying,

4    Freeze or the other person?

5        A    Neither one was close.

6        Q    Closer to you.  Were they right on top of

7    each other?

8        A    Yes, they was behind each other.  I mean, one

9    was behind -- literally behind the other one.

10       Q    Right.  So one of them was closer to you,

11   then?

12       A    No.  No.  I mean, I'm not sure.  I'm not

13   sure.

14       Q    What was the -- there is one person saying,

15   Freeze.  Is that the person that had a gun?

16       A    Yes.

17       Q    Did the other person have a gun?

18       A    I'm not sure.

19       Q    You couldn't see anything?

20       A    No.

21       Q    Was the other person standing, running,

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 40

1    laying on the ground?  What was the other person

2    doing?

3         A    They were both running, running towards my

4    direction.

5         Q    After the one person said, Freeze, what did

6    the other person do, if anything?

7         A    I'm not sure.

8         Q    Did they stop?

9         A    I'm not sure, because I turned around to head

10   the other direction.  But I'm looking behind me.  They

11   are still chasing each other.  I mean, he was still

12   chasing whoever he was chasing, I guess.

13        Q    So the other person was still moving?

14        A    Yes.

15        Q    And then what happened?

16        A    I heard a gunshot.  My legs got numb, so I

17   fell to the ground.  And I called my girlfriend

18   immediately to tell her, Hurry up.  I just got shot.

19        Q    You called your girlfriend first?

20        A    Yes.

21        Q    Not an ambulance?

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 49

1       A    I'm not -- No, I never said that.

2       Q    You didn't say this?

3       A    No.

4       Q    It then says, the officer said, Freeze.  And

5   Mr. Arrington looked at the officer, saw the subject

6   running in the alley drop a gun to the ground.  So Mr.

7   Arrington turned back around, started running again.

8            Do you recall seeing someone drop a gun in

9   the alley?

10      A    I saw a gun on the ground while they were

11  running.  But I never seen them drop the gun.

12      Q    So you never told the officer that you saw

13  someone drop a gun?  Is that what you are saying?

14      A    I'm not sure what I -- I'm not sure.

15      Q    Did you ever tell the officer that

16  interviewed you that you believed that you were shot

17  on purpose?

18      A    No.

19      Q    Do you believe now that you were shot on

20  purpose?

21           MS. JOHNSON:  Objection.

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 50

1          THE WITNESS:  No.

2          BY MS. FROST:

3      Q    No?

4      A    No.

5      Q    I'm showing you the amended complaint that

6    your lawyer filed in this case.

7          It says, Upon information and belief, this is

8    paragraph 12 of the amended complaint in this action,

9    Upon information and belief, Detective Norris in plain

10   clothing ran into the alley and observed the suspect

11   that he was chasing run in the opposite direction and

12   where Mr. Arrington was standing.

13         Paragraph 13.  Detective Norris then

14   commanded Mr. Arrington to hold his hands up.

15   Approximately two seconds after the detective

16   commanded Mr. Arrington to hold his hands in the air,

17   the detective shot Mr. Arrington.

18         Were you ever told by anyone to put your

19   hands up while you were in the alley?

20     A    No, I wasn't.

21     Q    So you had basically no warning before you

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 51

1    were shot?

2        A    No.

3        Q    Paragraph 14.  When Mr. Arrington asked

4    Detective Norris, Why did you shoot me, you were

5    chasing him, the detective proceeded to handcuff Mr.

6    Arrington.

7            Did you ever -- you told me that you had

8    said, Why did you shoot me.  But did you also add --

9        A    No.

10       Q    So you did not say this --

11       A    No, I didn't.

12       Q    -- to the detective?

13       A    No, I didn't.

14           MR. WHITERU:  What paragraph were those?

15           MS. FROST:  12 through 14 of the amended

16   complaint.

17           BY MS. FROST:

18       Q    As far as the marked cruiser that was going

19   down Nicholson Street, did you ever see anyone get out

20   of that car?

21       A    No, I didn't.

DEPOSITION OF DAVID RYLAND ARRINGTON
Conducted on June 30, 2008

Page 52

1    Q    And could you see whether -- could you tell

2  whether the car continued straight onto Nicholson or

3  whether it turned?

4    A    I'm not sure.

5    Q    So after you were shot, an ambulance arrived?

6    A    Yes.  An ambulance arrived.

7    Q    And you were taken to a hospital?

8    A    Yes.

9    Q    What hospital were you taken to?

10    A    I was taken to George Washington Hospital

11  Center.

12    Q    And that's George Washington University

13  Hospital.  Correct?

14    A    Yes.

15    Q    Down 23rd?

16    A    Yes, University Hospital.

17    Q    As opposed to Washington Hospital Center?

18    A    Yes.

19    Q    And were you conscious the whole time?

20    A    Yes, I was conscious.

21    Q    Did you ever lose consciousness?

```
- - - - - - - - - - - - - - - x
                              :
The Interview of              :        ORIGINAL
                              :
David Arrington               :
                              :
                              :
                              :
- - - - - - - - - - - - - - - x   August 26, 2006
```

**TAPE RECORDING ARRINGTON v. DC - ARRINGTON**

PRESENT:

SARGENT NICHOLAS BRUEL
Enforcement Investigation Team

*CompuScribe*
*(301) 577-5882*

mls

2

**P R O C E E D I N G S**

1

2          (Whereupon, the recorded interview begins.)

3          SARGENT BRUEL:  Okay, today's date is, we are now

4    Saturday, August 26, 2006.  It's 12:02 a.m. and I am in the

5    GW Hospital emergency room.

6          I'm Sargent Nick Bruel with Enforcement

7    Investigation Team.  I am standing next to a gentleman who

8    may have been shot by an MPD officer.

9          Sir, if you could identify yourself for the tape.

10          MR. ARRINGTON:  David Arrington.

11          SARGENT BRUEL:  Where do you live sir?

12          MR. ARRINGTON:  I live at 1957 19th Place,

13    Southeast, Apartment 305.

14          SARGENT BRUEL:  What is your date of birth?

15          MR. ARRINGTON:  12/18/84.

16          SARGENT BRUEL:  Do you understand before I ask you

17    any questions about what happened and what happened to you, I

18    am going to give you your rights?

19          MR. ARRINGTON:  Okay.

20          SARGENT BRUEL:  Do you know what your rights are?

21          MR. ARRINGTON:  What's my rights?

22          SARGENT BRUEL:  You have the right to remain

23    silent.  Anything you say can be used against you in a court

24    of law.

1          MR. ARRINGTON:  Okay.

2          SARGENT BRUEL:  Anything you say on this tape can

3    be used against you, okay?

4          MR. ARRINGTON:  Okay.

5          SARGENT BRUEL:  You have the right to be

6    represented by an attorney.  Before you make any statements,

7    if you wish to make any statements to me now you can stop

8    answering any of my questions before you talk to an attorney.

9    You also have the right to have an attorney with you when you

10   answer questions, okay?

11         MR. ARRINGTON:  Okay.

12         SARGENT BRUEL:  For the purposes of this tape

13   because you are in handcuffs even though they are not

14   connected, we are going to consider this a custodial and you

15   are under arrest for right now, interrogation, okay?

16         MR. ARRINGTON:  Okay.

17         SARGENT BRUEL:  However, for the purposes of what I

18   do, I'm with the Enforcement Investigation Team, I'm not

19   investigating whatever it is you may or may not have done.  I

20   want to just hear your story from when you were shot.  So, we

21   understand that?

22         MR. ARRINGTON:  Yes.

23         SARGENT BRUEL:  But I also want you to understand

24   that if you get charged with something this can come into

25   evidence as well, okay?

1    MR. ARRINGTON:  Okay.

2    SARGENT BRUEL:  So if you would please, did you

3 give me your date of birth?

4    MR. ARRINGTON:  12/18/84.

5    SARGENT BRUEL:  So, how old are you?

6    MR. ARRINGTON:  21.

7    SARGENT BRUEL:  You are 21?

8    MR. ARRINGTON:  Yes.

9    SARGENT BRUEL:  If you would please, just tell me

10 what happened this evening.

11    MR. ARRINGTON:  I was coming from my friend's

12 house, she lives on Prout Street, I don't know if it is 22,

13 it's 22 something on Prout Street.

14    SARGENT BRUEL:  2200 block of Prout?

15    MR. ARRINGTON:  Yeah.  I got to her house because I

16 had been drinking, I had been drinking a little bit.  So, I

17 was walking towards the store.  I was walking to Mario's

18 Pizza to get my food.

19    When I was walking up the alley, I didn't get too

20 far to the alley because I parked in the back of her house.

21 My car was in the back of her house.  As I walked through the

22 alley I seen somebody running through.

23    My first instinct was to run because I didn't know

24 if they was coming towards me or whatever.  So, I run back

25 towards her house.  The police car pull up.

1    I stopped and I turned around and he said, freeze.

2    But then I turned back around and kept running because I saw

3    when the person was running towards me a gun fell to the

4    ground.  It had dropped.

5    My first instinct, I don't know if he is going to

6    pick it up and shoot me or not so he ran down the alley

7    towards this way (indicating) to the right.

8    He ran that way (indicating).  When I turned back

9    around the police, when I heard him say freeze and I saw when

10    he had the gun.  He shot but I don't know who.

11    I thought he was shooting at the person who had the

12    gun but my leg got numb so I just fell to the ground.  When I

13    fell that's when he asked me, was that my gun?  I told him it

14    wasn't my gun.

15    My fingerprints, nothing is on that gun.  I don't

16    have nothing to do with that situation.  That is when he

17    called for an ambulance and they came and got me.

18    SARGENT BRUEL:  Do you know what it was that

19    precipitated, meaning began, the officer to come down that

20    alley?

21    MR. ARRINGTON:  I don't even know.  I just saw the

22    police cruiser come down Nicholson Street because when I was

23    facing towards the alley when I was walking forward I saw him

24    come.

25    I saw him get out and he came around and he said,

1   freeze.  When he said freeze I just started running because

2   of him pointing the gun towards me.  When that rang, I heard

3   pow and he shot me in my leg.  That is all I know.

4          SARGENT BRUEL:  Do your best, if you can, to

5   describe the person you saw running.

6          MR. ARRINGTON:  I just saw a black shirt and black

7   hat, that's all I saw, black male, black shirt, black hat.

8          SARGENT BRUEL:  Do you know him?

9          MR. ARRINGTON:  I don't even know him.  I don't

10  even know him.  That is all I saw was a black male.  I can't

11  really describe him.  It happened so fast.  He is running, I

12  don't know what's going on or nothing.

13         SARGENT BRUEL:  You stated that that person dropped

14  a firearm?

15         MR. ARRINGTON:  Dropped a firearm.  It was like a

16  couple of distances in front of me.  It was right there

17  (indicating).

18         SARGENT BRUEL:  Did he run past you?

19         MR. ARRINGTON:  No.  I'm right here (indicating) in

20  front of him.  There is another exit to the alley that goes

21  this way (indicating).  The police saw him and he ran that

22  way (indicating).

23         The police saw him running right towards him.  Then

24  when he ran, that's when the police said, freeze.  I turned

25  around and ran and he let off a shot and he shot me.

1          SARGENT BRUEL:  How much time was there between the

2   other person you saw coming into the alley and you coming

3   into the alley and the policeman coming and saying --

4          MR. ARRINGTON:  I was in the alley --

5          SARGENT BRUEL:  In other words, when did this guy

6   drop the firearm?

7          MR. ARRINGTON:  I was in the alley.  It took me

8   like at least about three minutes.  I was sitting on her

9   front waiting for her to come out.  I got hungry and I said,

10  I'm gonna go to the store.  I called her.  I said, I'm going

11  to the store to get me something to eat I will be right back

12  at your house when I come back.

13         I came through her yard.  I walked because I was

14  gonna drive my car.  I said, no I'll just walk.  So, I

15  walked, I walked through the alley.

16         The next thing you know I see somebody running

17  through the alley, running real fast.  He had on a black

18  shirt, a black male, I didn't see no facial hair and he was

19  running.  He had a fitted cap on, black.

20         So, he dropped the gun when he was coming towards

21  me.  He didn't get all the way up on me because I was still

22  midway in the alley.  He dropped the gun, the gun fell.

23         He turned down the other way in the alley and

24  that's when the police came and said, freeze.  When I heard

25  freeze I looked at the police officer, the police officer saw

mls

1    me.

2            He saw when the gun dropped and everything.  He saw

3    the other suspect when the suspect dropped the gun because I

4    was facing towards both of them.

5            SARGENT BRUEL:  So, my way of understanding, you

6    were coming up in the opposite direction?

7            MR. ARRINGTON:  Opposite direction.

8            SARGENT BRUEL:  Okay, now I understand.

9            MR. ARRINGTON:  The police saw everything because I

10   was looking at everything going on and the police said,

11   freeze and I turned back around to run and he shoot me in my

12   leg.

13           SARGENT BRUEL:  Okay, where were you hit?

14           MR. ARRINGTON:  Huh?

15           SARGENT BRUEL:  Right here (indicating) and they

16   say it went to the other leg.  It went through my right

17   leg --

18           SARGENT BRUEL:  It went through the right leg and

19   went to your left leg?

20           MR. ARRINGTON:  Yeah.

21           SARGENT BRUEL:  You were shot from the back though,

22   correct?

23           MR. ARRINGTON:  From the back.

24           SARGENT BRUEL:  From the back, okay.  Did you drop

25   that firearm?

1              MR. ARRINGTON:  No, I didn't.

2              SARGENT BRUEL:  Do you know what it is that the

3    officer was responding to?

4              MR. ARRINGTON:  No, I heard shots.

5              SARGENT BRUEL:  You heard gunshots?

6              MR. ARRINGTON:  I heard gunshots.

7              SARGENT BRUEL:  How long before or after your

8    shooting did you hear gunshots?

9              MR. ARRINGTON:  Like, prior to like four minutes

10   before then because as I was walking through the alley I

11   heard, pow, pow, pow.

12             SARGENT BRUEL:  How many shots did you hear?

13             MR. ARRINGTON:  Police was sitting on the block on

14   Prout Street.  They was sitting right there because people

15   get shot down there.

16             So, as I'm walking through the alley I'm feeling

17   protected because the police are right there.  Then he came

18   running through the alley and then I get shot in the leg.

19             SARGENT BRUEL:  So, how long before you got to the

20   alley did you hear the shots or when did you hear the shots?

21             MR. ARRINGTON:  All right, as I was walking through

22   the back, I got to the back because I go past my car in the

23   back of her yard I heard pow, pow, pow.  But, I didn't think

24   nothing of it because I'm like I'm okay because the police

25   are on Prout Street.

1        SARGENT BRUEL:  You heard how many shots?

2        MR. ARRINGTON:  Like three, pow, pow, pow but I

3    didn't think nothing of it.  So, I'm walking and I just seen

4    somebody running and I'm like in the middle of it and I see

5    the gun fall and then the police like freeze and shoot me in

6    the leg.

7        SARGENT BRUEL:  Who else that you know of was there

8    and saw what happened, you being shot?

9        MR. ARRINGTON:  Wasn't nobody in the alley other

10   than me, the suspect whoever and the police officer.

11       SARGENT BRUEL:  What did the police officer say to

12   you after you were down?

13       MR. ARRINGTON:  The police officer asked me, is

14   that your gun he threw?  It wasn't my gun.  He said, is that

15   your gun, sir?  I said, no that is not my gun.

16       You didn't see me drop no gun up all the way right

17   here --- shot me at.  I was looking right at him when he

18   pulled up.

19       SARGENT BRUEL:  Can you describe the officer?

20       MR. ARRINGTON:  He had on a pink button up, it's

21   long sleeves.

22       SARGENT BRUEL:  Okay, so he wasn't in uniform?

23       MR. ARRINGTON:  No, he wasn't in uniform.

24       SARGENT BRUEL:  What kind of car was he driving?

25       MR. ARRINGTON:  They pulled up in a police cruiser.

1          SARGENT BRUEL:  A marked car, lights and

2    everything?

3          MR. ARRINGTON:  Yeah, lights and everything, yeah.

4          SARGENT BRUEL:  So, there were two officers or one

5    officer?

6          MR. ARRINGTON:  I think the other officer that was

7    driving began to chase the suspect or whatever and it went

8    straight down because they saw the other dude go through the

9    alley because they was chasing him.

10          SARGENT BRUEL:  How far away from the officer that

11    you believe shot you were you when you got shot?

12          MR. ARRINGTON:  How far?  I would say about --

13          SARGENT BRUEL:  Like how many feet and if you can't

14    estimate I don't want --

15          MR. ARRINGTON:  I can't really estimate but it was

16    pretty far.

17          SARGENT BRUEL:  More than from say me to that wall

18    (indicating)?

19          MR. ARRINGTON:  It's more than that, yeah.

20          SARGENT BRUEL:   So, that is more than 15 feet?

21          MR. ARRINGTON:  Yeah, it's more than that.

22          SARGENT BRUEL:  Tell me what you remember about

23    what the officer did in terms of the car pulled up, what

24    happened?  Did he get out of the car?

25          MR. ARRINGTON:  I think he came out, I mean, he

1  came from out that car because the car stopped.  He came from

2  out the car.

3           SARGENT BRUEL:  Was he the driver or the passenger?

4           MR. ARRINGTON:  The passenger because the cop ---.

5  chased the other dude.  I remember all of that.  It was

6  straight, I guess he kept him in the alley.

7           The officer said, freeze and when he said freeze I

8  looked at him and I kept running.  I turned back around and

9  ran.  I didn't know what was going on.  It's okay, pow, shot,

10  lights out.  I didn't have no reason to though.

11          When I saw the gun fall from the other dude that's

12  why I ran because my brother got shot like a couple of weeks

13  ago down there.

14          SARGENT BRUEL:  What is your brother's name?

15          MR. ARRINGTON:  Kenneth Arrington.

16          SARGENT BRUEL:  Kenneth Arrington, okay.  You

17  described the officer as wearing a pink button down shirt.

18  Was he black or white?

19          MR. ARRINGTON:  He was black, a black man.

20          SARGENT BRUEL:  How old was he do you think?

21          MR. ARRINGTON:  I don't even know.

22          SARGENT BRUEL:  Anything else on him that you

23  noticed?  How else was he dressed?

24          MR. ARRINGTON:  I just saw a pink button up plaid

25  shirt, pink shirt, pink collared shirt and I think he had

1    some khakis, I think so.

2             SARGENT BRUEL:  Anything else you remember about

3    him?

4             MR. ARRINGTON:  No.  He was a black male, that's

5    about it.  I really didn't pay no attention to him.

6             SARGENT BRUEL:  About what time did this happen?

7             MR. ARRINGTON:  This happened around like 9 or 9

8    something, 9 or 10.  It was one of them like 9:50 or 10:00.

9             SARGENT BRUEL:  So closer to 10 maybe?

10            MR. ARRINGTON:  Yeah.

11            SARGENT BRUEL:  You said you were going to get

12   pizza?

13            MR. ARRINGTON:  Yeah at Mario's.

14            SARGENT BRUEL:  How were you going to pay for the

15   pizza?

16            MR. ARRINGTON:  Cash.

17            SARGENT BRUEL:  Okay, because there was no cash in

18   your clothes.  How were you going to pay for the pizza?

19            MR. ARRINGTON:  I was going to pay for it cash.

20            SARGENT BRUEL:  There wasn't cash in your clothes.

21            MR. ARRINGTON:  I had a five dollar bill.

22            SARGENT BRUEL:  Okay, because there wasn't any cash

23   in your clothes.

24            MR. ARRINGTON:  I know I had a five dollar bill.

25            SARGENT BRUEL:  Was anyone else with you when you

1    were with your girlfriend?

2            MR. ARRINGTON:  No, I was sitting on her front.

3            SARGENT BRUEL:  Was she with you?

4            MR. ARRINGTON:  No, she was on her way.  That's my

5    last call.  The police officers took my cell phone because

6    she was calling me telling me she was on her way.  That was

7    my last phone call on my phone.

8            SARGENT BRUEL:  Was there a time limit or something

9    like that on the last phone call you made?

10           MR. ARRINGTON:  Yeah, there's time on there.

11           SARGENT BRUEL:  Any criminal charges you have had

12   in the past?

13           MR. ARRINGTON:  Yeah, I had carrying a pistol

14   without a license.

15           SARGENT BRUEL:  What else?

16           MR. ARRINGTON:  That's about it.

17           SARGENT BRUEL:  Are you on probation and parole?

18           MR. ARRINGTON:  I'm on probation now for that.  I'm

19   on a years probation.

20           SARGENT BRUEL:  Anything else you want to add or

21   that you can assist me with by giving me information on what

22   happened?

23           MR. ARRINGTON:  That's about it.  I mean, I don't

24   know what else happened but I know that gun wasn't mine,

25   nothing wasn't mine.  I didn't have nothing to do with

mls                                                                        15

1    nothing.

2                SARGENT BRUEL:  What do you think happened?

3                MR. ARRINGTON:  Somebody got shot.

4                SARGENT BRUEL:  I know that.  But, as far as you,

5    what do you think happened with you?

6                MR. ARRINGTON:  With me, I don't know.  I really

7    don't know.  I mean, they will probably hold me because they

8    didn't find the suspect because of that gun situation.  I

9    already know they are going to probably charge me on that.

10               SARGENT BRUEL:  I don't know if they found another

11   suspect or not.  I don't know that.  So, to understand what

12   it is your are saying, do you think you were shot by the

13   officer but not because you were the suspect but because the

14   suspect was moving in a different direction?

15               MR. ARRINGTON:  Yeah because the suspect was moving

16   in a different direction.

17               SARGENT BRUEL:  Was that suspect within line with

18   you?  In other words, what I am asking you is, is it possible

19   you were shot by accident is what I'm asking you?

20               MR. ARRINGTON:  I don't know.  I think it was on

21   purpose.  I don't know because he seen two black males in the

22   alley and he see a weapon on the ground.  That is why I think

23   he reacted to it the way he reacted to it.

24               SARGENT BRUEL:  You said you had something to

25   drink?

1      MR. ARRINGTON:  Yeah, I was drinking earlier but I

2  can focus.

3      SARGENT BRUEL:  I'm not saying anything, I just

4  want to know how much.

5      MR. ARRINGTON:  I wasn't really intoxicated, I just

6  had something to drink that's all.

7      SARGENT BRUEL:  How much did you have to drink?

8      MR. ARRINGTON:  Probably like a cup.  I had a cup.

9      SARGENT BRUEL:  Of what?

10     MR. ARRINGTON:  Of Remy.

11     SARGENT BRUEL:  Remy, all right.

12     MR. ARRINGTON:  That's it.  I don't do no drugs.

13     SARGENT BRUEL:  Anything else you want to add?

14     MR. ARRINGTON:  That is about it.

15     SARGENT BRUEL:  That will conclude the interview at

16  1215 hours.

17          (Whereupon, the recorded interview was concluded.)

18

19

20

21

22

23

24

25  KEYNOTE:  "---" Indicates inaudible in the transcript.

mls

# C E R T I F I C A T E

CompuScribe, hereby certifies that the attached pages represent an accurate transcript of the duplicated electronic sound recording of the recorded interview of David Arrington recorded on August 26, 2006 in the matter of:

ARRINGTON v. DC

By:

_Michelle L. Smiroldo_                    _7/14/08_
Michelle L. Smiroldo, Transcriber          Date

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID ARRINGTON,                          :
                                          :
              Plaintiff,                   :
                                          :
v.                                         :   Civil Case No.: 07-0170 (RBW)
                                          :
DISTRICT OF COLUMBIA,                      :
  ET AL.                                   :
                                          :
              Defendants.                  :

### PLAINTIFF'S SUPPLEMENTAL ANSWERS TO DEFENDANT DISTRICT OF COLUMBIA'S INTERROGATORIES

COMES NOW Plaintiff, David R. Arrington, by and through his attorneys, Anitha Johnson, Esq. and ODELUGO & JOHNSON, L.L.C. and propounds Plaintiff's Supplemental Answers to Interrogatories upon Defendant District of Columbia,

### PRELIMINARY STATEMENTS AND OBJECTIONS

a.    The information supplied in these Answers is not based solely on the knowledge of the executing party, but includes the knowledge of the party's agents, representatives and attorney, unless privileged.

b.    The word usage and sentence structure is that of the attorney and does not purport to be the exact language of the executing party.

c.    The information contained in these answers is being provided in accordance with the provisions and intent of the Federal Rules of Civil Procedure which require the disclosure of facts which may be relevant or which may lead to the discovery of relevant information. Accordingly, the party responding, by providing the information requested, does not waive objections to its admissions in evidence on grounds of materiality or relevancy or other proper grounds for objections.

d.    The Plaintiff objects to the Defendant's interrogatories to the extent that they attempt or purport to impose obligations beyond those imposed or authorized by

Page 3 of 5

the Federal Rules of Civil Procedure.

e.    The Plaintiff objects to the Defendant's interrogatories to the extent that they require the production of irrelevant information and/or are overly broad and burdensome.

f.    The Plaintiff objects to the Defendant's interrogatories to the extent that they require the disclosure of information protected by the attorney-client privilege or work-product doctrines.

g.    The Plaintiff objects to the Defendant's interrogatories to the extent that they attempt or purport to require the disclosure of information not in the personal knowledge of this Plaintiff

h.    Plaintiffs investigation is continuing and to the extent further information, responsive to these interrogatories, becomes known to this Plaintiff, these answers will be supplemented. Plaintiff also reserves the right to amend these answers as additional information is obtained.

i.    In addition to these general objections, the Plaintiff has noted certain additional specific objections in response to the various interrogatories.

<u>SUPPLEMENTAL ANSWERS TO INTERROGATORIES</u>

INTERROGATORY NO. 2.:  State in your own words a detailed description of exactly how the incident occurred, your physical movements (e.g., how the incident occurred, your observations of the physical movements of each person or object involved), what each person said and to whom each statement was made, the exact wording or content of all statements made by you, (if you do not recall exact wording, state the content of such statement and identify the person to whom said statements were made), and the time each of the above actions and/or statements occurred.

**Answer:**    **See Plaintiff's statement, attached hereto, which is a word for word transcription of Plaintiff's audio recorded statement issued on the day Plaintiff was shot by Defendant Officer Norris.**

**Plaintiff Arrington further states that the transcribed audio recorded statement, attached hereto, is the most accurate description of the subject shooting that Plaintiff has given at any**

Page 4 of  5

**time.**

INTERROGATORY NO. 4.:  Identify by name, address and telephone number (if the identity is unknown, describe the witness), each witness to the incident.

**Answer:**    **Plaintiff, Defendant Norris and Sergeant Wayne Rimel.**

**Additionally, see the transcribed statement of Defendant Norris and the transcribed 911 emergency recordings pertaining to the subject event which are attached hereto.**

Respectfully submitted,

ODELUGO & JOHNSON, LLC


<u>    /s/ Anitha Johnson    </u>
Anitha Johnson, #16725
6525 Belcrest Road
Suite 612
Hyattsville, Maryland 20782
Phone: (301) 832-3020
Fax: (301) 832-3029
Email: <u>anitha.johnson@odelugo.com</u>
*Counsel for Plaintiff*

S:\ARRINGTON, DAVID\Supp. Disc. Resp. 7.24.08.wpd

**AFFIRMATION**

I, David R. Arrington, do hereby certify under the penalty of perjury that on this 25 day of July , 2008, I read the contents of the foregoing Answers to Interrogatories and the facts alleged therein are true and correct to the best of my knowledge, information and belief.

David R. Arrington

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
OFFICE OF THE ATTORNEY GENERAL


þíííííííííííííííííííííí»
                                    °
DAVID ARRINGTON,                    °
                                    °
        Plaintiff,                  °
                                    °
v.                                  °    Case No.
                                    °
                                    °    07-0170 (RBW)
                                    °
DISTRICT OF COLUMBIA,               °
et al.                              °
                                    °
        Defendant.                  °
þíííííííííííííííííííííí¼



                        Tuesday,
                        July 1, 2008

DEPOSITION OF:

                DAN LEWIS


called for examination by counsel for the

District of Columbia, pursuant to notice of

deposition, in the Office of the Attorney

General, 441 4th Street, N.W., Washington,

D.C., when were present on behalf of the

respective parties:

8e9754c3-5ebe-4144-8b69-8cce1464d2dd

Page 2

APPEARANCES:

On Behalf of the District of Columbia:

SHANA FROST, ESQ.

Of:    D.C. Office of the Attorney
       General
       441 4th Street, N.W.

       Suite 600S

       Washington, D.C. 20001

       (202) 724-6534

       (202) 727-3625 fax

On Behalf of the Plaintiff:

ANITHA JOHNSON, ESQ.

OKIE C. WHITERU, ESQ.

Of:    Odelugo & Johnson, LLC

       6525 Belcrest Road

       Suite 612

       Hyattsville, MD  20782

       (301) 832-3020

8e9754c3-5ebe-4144-8b69-8cce1464d2dd

Page 8

1          Q     Okay, so the only evidence that

2     was relevant to your investigation was his

3     cell phone?

4          A     Yes.

5          Q     Okay.  And, do you recall

6     receiving several calls after that from me, my

7     office?

8          A     No, I don't.

9          Q     Okay.

10         A     I remember speaking to you twice.

11         Q     And, as far as your recollection,

12    you believe you responded to the letter, you

13    spoke to me after this?

14         A     I believe so, yes.

15         Q     And, did you ever prepare a

16    release or anything concerning his vehicle,

17    his watch, his shoes, his grandmother's keys?

18         A     We never had his vehicle.

19         Q     Oh, I'm sorry, his grandmother's -

20    -

21         A     Okay, we never had -- I just had

22    his grandmother's keys and his cell phone.

8e9754c3-5ebe-4144-8b69-8cce1464d2dd

1      Q      Okay.

2      A      I didn't have any of his cash, or

3    any of his clothing, or anything like that.

4      Q      Did you speak to his grandmother

5    concerning the keys prior to speaking to him?

6      A      I don't -- I know I spoke to his

7    grandmother.  I don't know whether -- or his

8    mother -- I don't know if it was his mother or

9    his grandmother, but I don't recall speaking

10   with his grandmother about the keys.

11     Q      Okay.  And today, have you

12   returned the keys?

13     A      No, I still have them, waiting for

14   him -- he can come and get them any time.

15     Q      Okay, and so it's your position

16   that he can get them at any time?

17     A      That's always been my position.

18     Q      Okay.  And, his shoes and his

19   clothing, is his clothing still part of

20   evidence?

21     A      His clothing, yes, and his shoes,

22   are still evidence.

8e9754c3-5ebe-4144-8b69-8cce1464d2dd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID ARRINGTON,                    :
                                    :
            Plaintiff,              :
                                    :
v.                                  :   Civil Case No.: 07-0170 (RBW)
                                    :
DISTRICT OF COLUMBIA,               :
  ET AL.                            :
                                    :
            Defendants.             :

## PLAINTIFF'S ANSWERS TO DEFENDANT DISTRICT OF COLUMBIA'S INTERROGATORIES

1. As to the person answering these Interrogatories, state your full name, present address, date of birth, social security number, and your height and weight at the time of the August 25, 2006 incident referred to in your Complaint (hereinafter "the incident").

**Answer:**

| | | |
|---|---|---|
| **Name:** | **David Ryland Arrington** | |
| **Address:** | **3131 Lyndale Place, SE** | |
| | **Washington, D.C. 20019** | |
| **DOB:** | **12.18.84** | |
| **SSN:** | **578 23 3278** | |
| **Height:** | **5'9" – 5'10"** | |
| **Weight:** | **Approximately 290 lbs** | |

2. State in your own words a detailed description of exactly how the incident occurred, your physical movements (e.g., how the incident occurred, your observations of the physical movements of each person or object involved), what each person said and to whom each statement was made, the exact wording or content of all statements made by you, (if you do not recall

exact wording, state the content of such statement and identify

the person to whom said statements were made), and the time each

of the above actions and/or statements occurred.

**Answer:**     **See Plaintiff's statement in the Metropolitan Police**
**Department's Final Investigative Report which is in**
**Counsel for Defendants possession.  Additionally,**
**counsel for Defendants is in possession of Plaintiff's**
**recorded statement taken the day after the subject**
**occurrence.**

**Additionally, Metro Police Department Officers seized**
**Plaintiff's property (watch, sneakers, cell phone, car**
**keys, and $5) and have refused to return them to**
**Plaintiff despite being fully aware that Plaintiff is**
**not a suspect in relation to the subject occurrence.**

3.  Identify by name, and/or badge number each law

enforcement officer, or describe in detail the physical

appearance of each, law enforcement officer, who you allege was

involved in the incident, and with respect to each officer, list

each act that constituted excessive force, the implements of

force used and by whom why you believe the force was excessive,

and what amount of force you contend would have been reasonable

and appropriate under the circumstances.

**Answer:   Defendant Norris.**

4.  Identify by name, address and telephone number (if the

identity is unknown, describe the witness), each witness to the

incident.

**Answer:    Plaintiff, Defendant Norris and Sergeant Wayne Rimel.**

5.   Fully identify by name, address,, telephone number, and relationship to you, if any, all persons, other than witnesses to the incident, who have knowledge or possess information regarding the incident, or upon whom you will rely to support your allegations, including your claims for damages and state briefly the matters to which each will testify.

**Answer:**   **Plaintiff objects to this interrogatory to the extent that it seeks Plaintiff's attorney's work product and mental impressions.  Without waiving said objections, Alesa Teague, Stephanie Riley, Emanuel Teague, Sergeant Nicholas Breul, Richard Griffin, John Holzwart, Detective Dan Lewis.  Additionally, all officers, investigators and witnesses noted in the Metro Police Department's Final Investigative Report, Police Reports and similar documents forwarded by Defendants to Plaintiff with the Defendants' discovery responses. Plaintiff reserves the right to supplement this Answer.**

6.   Describe in detail the basis of your claim that the District of Columbia negligently hired, trained and supervised Metropolitan Police Department officers, including but not limited to, the names of the Metropolitan Police Department officers that the District of Columbia failed to properly hire, train and supervise, the evidence to support the claim that the District of Columbia negligently hired, trained and supervised police officers and the witnesses you intend to call to support this claim and the substance of their likely testimony. Attach all documents related to this interrogatory.

**Answer:**   **See answer to interrogatory nos. 2, 4 and 5.  Plaintiff reserves the right to supplement this answer.**

7. Describe in detail the nature of the injuries alleged to have been sustained by you as a result of the incident, including the medical terms thereof (if known) and the part or parts of the body affected.

**Answer:** **Plaintiff was shot in the right leg by Defendant Norris. The bullet exited Plaintiff's right leg and entered Plaintiff's left leg. As of the date of these answers to interrogatories the bullet fired by Defendant Norris remains lodged in the Plaintiff's left upper thigh. Plaintiff experiences pain in his left leg in the area where the bullet is lodged.**

**Additionally, Plaintiff sustained bruising, cuts and scaring due to falling to the ground after being shot by Defendant Norris and having handcuffs cut from his wrists by officers of the MPD.**

8. If those parts of your body identified in response to Interrogatory No. 7 have ever been tested for reasons other than the injuries complained of in this proceeding, describe in detail the circumstances of such tests (e.g., the name and address of the person or institution performing the tests; the date each test was taken; the part of the body of which tests were taken; the condition revealed by each test).

**Answer: None.**

9. If you are claiming that any injuries referenced in response to Interrogatory No. 7 are permanent, describe in detail the nature and treatment of such permanent injuries and disability claimed to result there from (e.g., the physical activities

you are now prevented from performing as the result of said

permanent injuries; which injury limits each of the referred to

physical activities; and, the name, address and telephone number

of the person or persons you intend to rely upon to support the

allegation of permanency). If you or your attorney have written

reports verifying said allegation of permanency, attach a copy of

each such report.

**Answer:**  **Plaintiff has permanent aches, pains and scarring in
and around the upper thigh of both his left and right
legs.  Additionally, Plaintiff has a bullet permanently
lodged in his upper left thigh.  Plaintiff also walks
with a limp at times.**

   10.  Describe in detail any medical tests (e.g., x-rays,

MRIs, CT scans, nerve conduction tests, etc.) taken of you

subsequent to the incident and their circumstances (e.g., the

name and address of the person or institution performing the

tests; the date each test was taken; the part of the body of

which tests were taken; the condition revealed by each test; and

the cost of each test).

**Answer:**  **Plaintiff objects to this interrogatory on the grounds
that he is a lay person that is not competent to
provide medical testimony.  Please see the medical
reports attached to Plaintiff's Responses to
Defendants' Requests for Production of Documents.**

   11.  List in detail any psychological examinations, care or

treatment you have received which you attribute to the incident;

the name, address and telephone number of each therapist,

psychologist, counselor or the like; results of any tests,

diagnosis, course and dates of treatment course of treatment;

date you reached an endpoint; and when and whether you have been

released from care.

**Answer:    None.**

12.   State your complete psychological history prior to the

incident, including the name, address and telephone number of all

the therapists and counselors who have treated or examined you;

the names, address and telephone numbers of all hospitals,

rehabilitation facilities or clinics and the nature of the

service provided; and any illnesses or conditions, including drug

and alcohol dependency, for which you have received treatment or

counseling and the dates thereof.

**Answer:    Plaintiff objects to this interrogatory on the grounds
that it is overly broad, not properly limited in time
and scope and seeks information not reasonably
calculated to lead to the discovery of relevant and/or
admissible evidence.  Without waiving said objections,
none.**

13.   If you have ever claimed compensation for any injury

for which you seek  damages herein from any source other than the

present Defendants herein, describe in detail your claim (e.g.,

the names, addresses and telephone numbers of all such sources;

the titles of all proceedings had thereon; the dates and places

at which such proceedings were commenced and terminated and the

results thereof the names, addresses and telephone numbers of all

parties to such proceedings; and, the amounts paid to you, if

any).

**Answer:**    **Plaintiff objects to this interrogatory to the extent that it is contrary to the collateral source rule. Without waiving said objection, none.**

14.    Do you contend that your constitutional rights were violated as a result of the deliberate indifference on the part of policymakers in the District of Columbia and/or the Metropolitan Police Department to a pervasive custom or practice of violating citizens rights on the part of employees of the Metropolitan Police Department? If the answer is yes:

A.    Identify the policymaker(s).

B.    Describe the persistent and pervasive custom or practice.

C.    Identify and describe any and all incidents upon which you rely to support such allegations.

D.    Identify all witnesses who you contend support such a claim and summarize the information possessed by each witness that supports such a claim.

**Answer:**    **Plaintiff objects to this interrogatory on the grounds that it seeks Plaintiff's mental impressions, trial strategies and work-product.  Additionally, see answer to interrogatory no. 2.**

15.    Do you contend that your constitutional rights were violated as a result of the deliberate indifference on the part of the policymakers of the District of Columbia and/or the Metropolitan Police Department to a need for training and/or

supervision of employees of the Metropolitan Police Department?

If the answer is yes:

    A.   Identify the policymakers.

    B.   Describe in detail the training you contend was necessary to avoid violations of the relevant constitutional right.

    C.   Identify and describe all incidents upon which you will rely to support any contention that policymakers of the District of Columbia were deliberately indifferent to the need for training and that this lack of training and/or supervision resulted in constitutional violations.

    D.   Identify all witnesses who you contend support such a claim and summarize the information possessed by each witness that supports such a claim.

**Answer:**   **Plaintiff objects to this interrogatory on the grounds that it seeks Plaintiff's mental impressions, trial strategies and work-product.  Additionally, see answer to interrogatory no. 2.**

    16.   Identify any statutes, regulations and/or orders of the District of Columbia that you claim are evidence of an unconstitutional custom and/or policy on the part of the District of Columbia.

**Answer:**   **Plaintiff objects to this interrogatory because it seeks Plaintiff's mental impressions, trial strategies and work-product.**

17. Aside from the specific claims asserted in this lawsuit, describe completely any claim or lawsuit, including claims for workmen's compensation or other benefits, you have ever made or filed, or which was made or filed on your behalf, whether or not arising out of personal injury (e.g., the nature and amount of the claim; the identity(s) of the party(s) against whom the claim was made; the year, month, and day, if available, of the claim; if a lawsuit, the court and caption; and the disposition of the claim).

**Answer:    None.**

18. If you have ever been arrested, detained and/or adjudicated for the alleged commission of a felony, crime, offense or misdemeanor (including juvenile and immigration offenses), please state all the details of such incident (e.g., the time, date and location of each such arrest or detention; the specific charges for which you were arrested or detained on each such occasion; the court action number and the particular court where the action was filed; the particular charges which were the subject of each such court action; and the disposition of each).

**Answer:    Plaintiff objects to this interrogatory to the extent that it is overly board, not properly limited as to time and scope, and seeks information not reasonably calculated to lead to the discovery of relevant and/or admissible evidence.**

19.   Describe in detail the basis for your claim of intentional infliction of emotional distress. Include in your description a detailed recitation of the intentional and/or reckless acts you contend caused your alleged emotional distress, as well as a detailed description of the emotional distress you contend you have suffered.

**Answer:   See answer to interrogatory no. 2.**

20.   Itemize with particularity the out-of-pocket expenses or special damages incurred by you as a result of the alleged incident; identify and produce all documentation which exists to support such items of expense/loss.

**Answer:   George Washington University Hospital:   $6183.32**
**Medisyn Provider Network:       $2220.00**
**Nike Air Sneakers:   $200**

**Plaintiff reserves the right to supplement this answer.**

21.   Describe in detail any Federal, State or District of Columbia Government benefits for disability, unemployment, retirement, health care, or welfare benefits of any nature you have ever received (e.g., each benefit received, the name of the government entity paying each such benefit received, and which of the benefits are presently being received).

**Answer:   Plaintiff objects to this interrogatory to the extent that it is contrary to the collateral source rule. Without waiving said objection, none.**

22.   Describe in detail your employment history for the last ten (10) years to date (e.g., each job that you have held; the

type of work each job required; for whom you were working at each job, including the name and address of your immediate supervisor for each job position stated; your salary for each job; reason your employment was terminated; and the date when you first began each job and the date that employment was terminated). Please attach a signed authorization form for all employment records. An authorization form is attached hereto.

**Answer:**    **Oct. '06 - present:  Dept. of Public Works**
**Sept. '03 - July '06:  D.C. Public Schools**
**'98 - '03:  Student**

23.  Describe in detail any claim for loss of wages or other income as a result of the incident, (e.g., all earnings or sums of money which you claim to have been deprived of by reason of the incident, the method prevented from earning said income, and whether you were working part-time or whether you were fully unable to work during the period of such loss).

**Answer:    None.**

24.  For each expert witness you expect to call at the trial of this action, state all information referenced in Fed. R. Civ. P. 26. For each expert witness please state the witness's qualifications and attach the witness's curriculum vitae. Please state the subject matter on which the expert will testify, the substance of the facts and opinions to which the expert is

expected to testify, and a summary of the grounds of each such opinion.

**Answer:**       **Alwin Harding, MD**
              **Medisyn Provider Network**
              **650 Pennsylvania Avenue, SE**
              **Suite 360**
              **Washington, DC 20003**

              **Dr. Harding will testify that the injuries to Plaintiff's right and left thigh were caused, directly and proximately, by the gun shot fired by Defendant Norris which hit the Plaintiff. Dr. Harding will testify as to the nature of Plaintiff's injuries as well. Additionally Dr. Harding will testify that all Plaintiff's healthcare bills are fair, reasonable and necessary. All opinions proffered by Dr. Harding will be to a reasonable degree of medical certainty.**

              **Mr. Shannon Boher**
              **7320 Slachs Road**
              **Sykesville, Maryland 21784**

              **Mr. Boher is an excessive force expert that will testify to a reasonable degree of professional certainty that Defendant Norris utilized excessive force and breached the national standard of care in relation to the subject shooting of Plaintiff.**

              **Plaintiff reserves the right to supplement this answer.**

      25. Describe in detail the basis for your claim of conversion. Include in your answer a description of the personal property you claim was converted, how such property was converted, the approximate value of any such allegedly converted property, efforts you claim you made to recover the allegedly converted property, and the individuals you believe were involved in the conversion. Attach any and all receipts for the allegedly converted property.

**Answer:**    **See answer to interrogatory no. 2.**

Respectfully submitted,

ODELUGO & JOHNSON, LLC

Anitha Johnson, #16725
6525 Belcrest Road
Suite 612
Hyattsville, Maryland 20782
Phone: (301) 832-3020
Fax: (301) 832-3029
Email: anitha.johnson@odelugo.com
Counsel for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID ARRINGTON,                          :
                                          :
            Plaintiff,                    :
                                          :
v.                                        :  Civil Case No.: 07-0170 (RBW)
                                          :
DISTRICT OF COLUMBIA,                     :
  ET AL.                                  :
                                          :
            Defendants.                   :

### PLAINTIFF'S SUPPLEMENTAL ANSWERS TO INTERROGATORIES

3.   Identify by name, and/or badge number each law
enforcement officer, or describe in detail the physical
appearance of each, law enforcement officer, who you allege was
involved in the incident, and with respect to each officer, list
each act that constituted excessive force, the implements of
force used and by whom why you believe the force was excessive,
and what amount of force you contend would have been reasonable
and appropriate under the circumstances.

**Answer:**   **Plaintiff objects to this interrogatory to the extent
that Plaintiff is not qualified to opine as to what
constitutes excessive force. Furthermore, Plaintiff
objects to this interrogatory because it seeks
information in the Defendants possession. Without
waiving said objections, Plaintiff states Defendant
Norris shot and handcuffed him. Furthermore, Plaintiff
incorporates his recorded statement, which is in
Defendants possession, herein.**

5.   Fully identify by name, address,, telephone number, and
relationship to you, if any, all persons, other than witnesses to
the incident, who have knowledge or possess information regarding
the incident, or upon whom you will rely to support your

allegations, including your claims for damages and state briefly

the matters to which each will testify.

**Answer:**     **Plaintiff objects to this interrogatory to the extent
that it seeks information gathered in anticipation of
litigation and/or work product. Furthermore, Plaintiff
objects to the extent that Defendant is in possession
or is in better position to obtain information sought
by this interrogatory. Without waiving said
objections, Sergeant Nicholas Breul, Detective Dan
Lewis and all officers, investigators and witnesses
noted in the Metro Police Department's Final
Investigative Report, Police Reports and similar
documents forwarded by Defendants to Plaintiff with the
Defendants' discovery responses.**

**Ilesa Teague (Plaintiff's girlfriend) has knowledge as
to the location of the subject occurrence and
Plaintiff's whereabouts on the day of the subject
shooting. Ilesa Teague resides at 2233 Prout Street,
SE, Washington, D.C. 20020 and her phone number is
(202) 584-0543.**

**Stephanie Riley is Ilesa Teague's sister. Ms. Riley
has knowledge as to the location of the subject
occurrence and Plaintiff's whereabout prior to the
subject shooting. Ms. Riley can be reached at (202)
562-6738 and resides in Washington, D.C.**

**Plaintiff reserves the right to supplement this Answer.**

6.   Describe in detail the basis of your claim that the

District of Columbia negligently hired, trained and supervised

Metropolitan Police Department officers, including but not

limited to, the names of the Metropolitan Police Department

officers that the District of Columbia failed to properly hire,

train and supervise, the evidence to support the claim that the

District of Columbia negligently hired, trained and supervised

police officers and the witnesses you intend to call to support

this claim and the substance of their likely testimony. Attach

all documents related to this interrogatory.

**Answer:**   **See Plaintiff's recorded statement which is in the**
        **possession of Defendants.  Plaintiff will supplement**
        **this Answer upon receipt of additional discovery from**
        **Defendants.**

   14.   Do you contend that your constitutional rights were

violated as a result of the deliberate indifference on the part

of policymakers in the District of Columbia and/or the

Metropolitan Police Department to a pervasive custom or practice

of violating citizens rights on the part of employees of the

Metropolitan Police Department? If the answer is yes:

   A.    Identify the policymaker(s).

   B.    Describe the persistent and pervasive custom or

practice.

   C.    Identify and describe any and all incidents upon which

you rely to support such allegations.

   D.    Identify all witnesses who you contend support such a

claim and summarize the information possessed by each witness

that supports such a claim.

**Answer:**   **See Plaintiff's recorded statement which is in the**
        **possession of Defendants.  Plaintiff will supplement**
        **this Answer upon receipt of additional discovery from**
        **Defendants.**

   15.   Do you contend that your constitutional rights were

violated as a result of the deliberate indifference on the part

of the policymakers of the District of Columbia and/or the

Metropolitan Police Department to a need for training and/or

supervision of employees of the Metropolitan Police Department?
If the answer is yes:

    A.    Identify the policymakers.

    B.    Describe in detail the training you contend was
necessary to avoid violations of the relevant constitutional
right.

    C.    Identify and describe all incidents upon which you will
rely to support any contention that policymakers of the District
of Columbia were deliberately indifferent to the need for
training and that this lack of training and/or supervision
resulted in constitutional violations.

    D.    Identify all witnesses who you contend support such a
claim and summarize the information possessed by each witness
that supports such a claim.

**Answer:**    **See Plaintiff's recorded statement which is in the
possession of Defendants.  Plaintiff will supplement
this Answer upon receipt of additional discovery from
Defendants.**

    16.    Identify any statutes, regulations and/or orders of the
District of Columbia that you claim are evidence of an
unconstitutional custom and/or policy on the part of the
District of Columbia.

**Answer:**    **None.**

    18.    If you have ever been arrested, detained and/or
adjudicated for the alleged commission of a felony, crime,
offense or misdemeanor (including juvenile and immigration
offenses), please state all the details of such incident (e.g.,

the time, date and location of each such arrest or detention; the specific charges for which you were arrested or detained on each such occasion; the court action number and the particular court where the action was filed; the particular charges which were the subject of each such court action; and the disposition of each).

**Answer:**    **Plaintiff objects to this interrogatory on to the extent that it is overly board, not properly limited as to time and scope, and seeks information not reasonably calculated to lead to the discovery of relevant and/or admissible evidence. Without waiving said objection, Plaintiff was convicted of carrying a firearm without a license in January, 2006.**

19. Describe in detail the basis for your claim of intentional infliction of emotional distress. Include in your description a detailed recitation of the intentional and/or reckless acts you contend caused your alleged emotional distress, as well as a detailed description of the emotional distress you contend you have suffered.

**Answer:**    **See Plaintiff's recorded statement which is in the possession of Defendants. Plaintiff asserts that his distress consists of fear of being shot by police officers and discomfort where he was shot.**

20. Itemize with particularity the out-of-pocket expenses or special damages incurred by you as a result of the alleged incident; identify and produce all documentation which exists to support such items of expense/loss.

**Answer:**    **George Washington University Hospital:  $6183.32**
             **Medisyn Provider Network:      $2220.00**

             **Plaintiff reserves the right to supplement this answer.**

22.  Describe in detail your employment history for the last ten (10) years to date (e.g., each job that you have held; the type of work each job required; for whom you were working at each job, including the name and address of your immediate supervisor for each job position stated; your salary for each job; reason your employment was terminated; and the date when you first began each job and the date that employment was terminated).  Please attach a signed authorization form for all employment records. An authorization form is attached hereto.

**Answer:**

> **Oct. '06 - present:**
> **Dept. of Public Works**
> **Supervisor: Dennis Butler**
> **Salary: $17.86 per hour (40 hours a week)**
> **Position: Motor vehicle operator**
>
> **Sept. '03 - July '06:**
> **D.C. Public Schools**
> **Supervisor: Does not recall**
> **Location: Eastern Senior High School**
> **Position: Teacher's Assistant**
> **Salary: $11.50 per hour (40 hours a week)**
> **Reason for leaving: Summer started and Plaintiff's position**
> **was not utilized during summer.**
>
> **'98 - '03:  Student**
>
> **Plaintiff reserves the right to supplement this answer.**

25.  Describe in detail the basis for your claim of conversion. Include in your answer a description of the personal property you claim was converted, how such property was converted, the approximate value of any such allegedly converted property, efforts you claim you made to recover the allegedly

converted property, and the individuals you believe were involved

in the conversion. Attach any and all receipts for the allegedly

converted property.

**Answer:**      **See answer to interrogatory no. 2.  Additionally,**
**Plaintiff's property had the following value:**

|  |  |
|---|---|
| **Watch:** | **$50** |
| **Sneakers:** | **$200.00** |
| **Cell phone:** | **$250.00** |
| **Car keys:** | **$260.00** |
| **Cash:** | **$5** |
| **Jeans:** | **$100.00** |
| **Shirt:** | **$5.00** |

Respectfully submitted,

ODELUGO & JOHNSON, LLC

_/s/ Anitha Johnson_____
Anitha Johnson, #16725
6525 Belcrest Road
Suite 612
Hyattsville, Maryland 20782
Phone: (301) 832-3020
Fax: (301) 832-3029
Email: anitha.johnson@odelugo.com
Counsel for Plaintiff

S:\ARRINGTON, DAVID\Plaintiff's Supplemental Answers to Interrogatories 6.25.08.wpd

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**



**Civil Litigation Division**
**Section II**

May 22, 2008

Anitha Johnson
6525 Belcrest Road, Suite 612
Hyattsville, MD 20782

Re: *David Arrington v. District of Columbia,* et al., C.A. No. 07-0170 (RBW)

Dear Ms. Johnson:

I am in receipt of your client's responses to the District of Columbia's discovery requests. Having reviewed the discovery responses, there are a number of deficiencies that must be addressed by the Plaintiff and are outlined herein as follows:

1.      Plaintiff's interrogatory responses are not signed. Federal Rule of Civil Procedure 33(b)(1)(A) requires that interrogatories be answered by the party to whom they are directed, i.e., Mr. Arrington. Pursuant to Fed. R. Civ. P. 33(b)(3), the responses must be made under oath, and pursuant to Rule 33(b)(5), "[t]he person who makes the answers must sign them, and the attorney who objects must sign any objections." Please submit interrogatory responses that are signed, under oath, by Mr. Arrington.

2.      Interrogatory Number 3 asks that Plaintiff identify the law enforcement officers allegedly involved in the incident and to list each act that Plaintiff contends constituted excessive force, the implements of force used and by whom, why Plaintiff believes the force was excessive, and what amount of force Plaintiff contends would have been reasonable and appropriate under the circumstances. Plaintiff's does not respond to this interrogatory in that his answer simply is "Detective Norris." Please fully respond to this interrogatory.

3.      Interrogatory Number 5 asks that Plaintiff identify by name, address, telephone number, and relationship to Plaintiff, if any, all persons, other than witnesses to the incident, who have knowledge or possess information regarding the incident, or upon whom Plaintiff will rely to support his allegations, including his claims for damages, and to state briefly the matters to which each will testify. Plaintiff identifies a number of individuals, but does not provide their addresses, telephone numbers, relationship to him, or the matters to which each witness is expected to testify. Please fully respond to this interrogatory.

4.     Interrogatory Number 6 asks that Plaintiff describe the basis for his claim that the District of Columbia negligently hired, trained and supervised MPD officers. Plaintiff's reference to prior interrogatory answers is non-responsive to this question. Please answer this question.

5.     Interrogatory Number 14 asks Plaintiff to describe the basis for any claim that his constitutional rights were violated as a result of the deliberate indifference on the part of policymakers in the District of Columbia and/or the MPD to a pervasive custom or practice of violating citizens rights on the part of employees of the MPD. The interrogatory also asks Plaintiff to identify the policymaker(s); to describe the persistent and pervasive custom or practice; to identify and describe any and all incidents upon which Plaintiff relies to support such allegations; and to identify all witnesses Plaintiff contends support such a claim and to summarize the information possessed by each witness that supports such a claim. In response, Plaintiff refers to his answer to Interrogatory Number 2, where he cites to a report prepared by the Force Investigation Team finding Officer Norris' actions to be justified. Please clarify how Plaintiff's answer is responsive to this interrogatory. In addition, Plaintiff's response that the interrogatory seeks "Plaintiff's mental impressions, trial strategies and work-product" is nonsensical as these are privileges that are not applicable to Plaintiff's thought processes. Thus, please fully respond to this interrogatory. If Plaintiff has no such evidence to support his claim, then Plaintiff should so state.

6.     Interrogatory Number 15 asks Plaintiff to describe the basis for any claim that his constitutional rights were violated as a result of the deliberate indifference on the part of the policymakers of the District of Columbia and/or the MPD to a need for training and/or supervision of employees of the MPD. The interrogatory also asks Plaintiff to identify the policymakers; to describe in detail the training Plaintiff contends was necessary to avoid violations of the relevant constitutional right; to identify and describe all incidents upon which Plaintiff will rely to support any contention that policymakers of the District of Columbia were deliberately indifferent to the need for training and that this lack of training and/or supervision resulted in constitutional violations; and to identify all witnesses Plaintiff contends support such a claim and to summarize the information possessed by each witness that supports such a claim. Plaintiff responds with the identical deficient response he provided to Interrogatory Number 14. Please answer this question.

7.     Interrogatory Number 16 asks Plaintiff to identify any statutes, regulations and/or orders of the District of Columbia that Plaintiff claims are evidence of an unconstitutional custom and/or policy on the part of the District of Columbia. Plaintiff asserts a non-existent privilege in response. Please answer the question; if Plaintiff is not aware of any such statutes, regulations, or orders, than Plaintiff should so state.

8.     Interrogatory Number 18 asks Plaintiff to identify his criminal history. This is discoverable information. Please answer this question.

9.      Interrogatory Number 19 asks Plaintiff to state the basis for his emotional distress claim. Plaintiff's response, which references his answer to Interrogatory Number 2, is non-responsive. Please answer this question.

10.     Interrogatory Number 22 inquires into Plaintiff's employment history, including each job held; the type of work each job required; for whom Plaintiff worked at each job, including the name and address of Plaintiff's immediate supervisor for each job position stated; salary for each job; and the reason the employment terminated. While Plaintiff responds with basic employment dates and employer, Plaintiff does not provide the detail requested by the interrogatory. Please fully respond to this interrogatory.

11.     Interrogatory Number 25 asks Plaintiff to describe the basis for his conversion claim, including a description of the personal property at issue, how such property was converted, the approximate value of any such allegedly converted property, efforts Plaintiff made to recover the allegedly converted property, and the individuals Plaintiff believes were involved in the conversion. The interrogatory also asks Plaintiff to attach any and all receipts for the allegedly converted property to his response. Plaintiff's reference to his answer to Interrogatory Number 2 does not fully respond to Interrogatory Number 25. Please fully respond to this interrogatory.

Please have your client correct these deficiencies within the next ten days so that we may avoid inconveniencing the Court on this matter. Finally, as you have not responded to my requests for possible dates for the deposition of your client, I have enclosed a Notice of Deposition for June 24, 2008 at the Office of the Attorney General.


Sincerely,

PETER J. NICKLES
Interim Attorney General for the District of Columbia


BY:
Shana L. Frost
Assistant Attorney General


Enclosure

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
SEARCH WARRANT

D6CRWSLD 2792

TO:     CHIEF OF POLICE, METROPOLITAN POLICE DEPARTMENT OR AUTHORIZED AGENTS
(Specific Law Enforcement Officer or Classification of Officer of the Metropolitan Police Department or other Authorized Agency)

Affidavit, herewith attached, having been made before me by     Detective Dan A. Lewis DII-44

that he has probable cause to believe

that on the (person) (premises) (vehicle) (object) known as     A silver in color Motorola i870 NEXTEL camera phone bearing s/n:

364YFU4N75 and phone number:202-489-4080 there is being concealed stored information regarding:

August 25, 2006
26

in the District of Columbia, there is now being concealed certain property,     To include Text messages, Text Message Content,

Voicemails, recorded phone history, subscriber information, owner information, downloads, internet activity, instant messages, plus
photographs and images, call records, internal phone book, and any other information stored in this nextel cell phone.

which is     Evidence of DC Code 22-401 Assault w/intent to kill and 22-405 Assault on a Police Officer.     and as I am satisfied
(Alleged grounds for seizure)

that there is probable cause to believe that the property so described is being concealed on the above designated (person) (premises),
(vehicle) (object) and that the foregoing grounds for issuance of the warrant exist.

YOU ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search in the daytime/at any time of the
day or night, the designated (person) (premises) (vehicle) (object) for the property specified and if the property be found there.

YOU ARE COMMANDED TO SEIZE IT, TO WRITE AND SUBSCRIBE an inventory of the property seized, to leave a copy of this
warrant and return to file, a further copy of this warrant and return with the Court on the next Court day after its execution.

Issued this  1st  day of  Sept.  , 20 06

Judge, Superior Court of the District of Columbia

### RETURN

I received the above detailed warrant on  SEPT. 1ST  , 20 06  and have executed it as follows:
On  SEPT. 2ND  , 20 06, at  5:00  P.M., I searched the
(person) (premises) (vehicle) (object) described in the warrant and I left a copy of the warrant and return with _____
property posted.

(Name of person searched or owner, occupant, custodian or person present at place of search)

The following is an inventory of the property taken pursuant to this warrant:

(3) VIDEO CLIPS FROM cell phone photo gallery.

This inventory was made in the presence of  DET LEWIS / DET. BROWN / DET. GAFFNEY

I swear that this is a true and detailed account of all property taken by me under this warrant.     DII-44

Executing Officer

Subscribed and sworn to before me this  13  day of  Sept  , 20 06

Judge, Superior Court of the District of Columbia